**In re Kathleen Thelma STEWART–JOHNSON, Debtor.**

**Kathleen Thelma Stewart–Johnson, Plaintiff,**

v.

**Sallie Mae Servicing; Texas Guaranteed Student Loan Corporation, Defendants.**

Bankruptcy No. 2–02–20129–RJH.
Adversary No. 03–292.

United States Bankruptcy Court, D. Arizona.

Jan. 13, 2005.

**194**

Alan M. Levinsky, Anderson, Brody, Levinson, Weiser & Horwitz, P.A., Phoenix, AZ, for TGSLC.

## OPINION GRANTING DISCHARGE OF STUDENT LOANS

RANDOLPH J. HAINES, Bankruptcy Judge.

After trial, the Court finds and concludes that the Debtor has demonstrated the requisite undue hardship to discharge her student loan obligations. The Court also concludes that Ninth Circuit law that permits a partial discharge does not re-quire a bankruptcy court to consider it in every case where undue hardship has been established, and that the objecting creditor should have the burden of proving the amount of partial discharge that would not impose an undue hardship, but that in any event any amount of this student loan debt would impose an undue hardship on this debtor.

### Facts Established at Trial

Kathleen T. Stewart–Johnson ("Debtor") graduated from Arizona State University in December 1994. She consolidated her student loans in 1995. The Debtor con-tends the amount then due was $22,042.69, and the Texas Guaranteed Student Loan Corporation ("Texas") contends the amount then due was $27,604.93, but the Court concludes this difference is not ma-terial to its decision.

The Debtor made regular payments on her student loan in amounts ranging from $100 to $150 per month. The Debtor con-tends she never defaulted on any payment until April of 2002, and Texas introduced no evidence to the contrary. Given this admirable repayment history, Texas essen-tially conceded that the Debtor had estab-lished that she had made a good faith effort to repay the loans.

The Debtor filed bankruptcy in Decem-ber of 2002, was granted her discharge in April of 2003, and that same month filed her complaint seeking discharge of her student loans. The parties also dispute the amount currently owing. Texas con-tends that the amount due as of December 15, 2004, was $47,783.04, whereas the Debtor introduced an Experian Credit Re-port reflecting that Texas had claimed the past due amount was $55,401. Again, however, the Court determines the differ-ence is not material to its decision. More-over, because the Experian Credit Report was not introduced for the truth of the

matter asserted and would have constituted hearsay had it been offered for that purpose, the only real evidence of the amount of the debt due as of December 15, 2004, was Texas' evidence that it was $47,783.04.

The education for which the Debtor's student loans paid resulted in the Debtor receiving a bachelor's degree in the social sciences, which enabled her to obtain a job with the State of Arizona Child Protection Services. She has worked there for nine years at a monthly gross pay of $3,010. After withholding, her monthly net pay is approximately $2,260. She testified that state workers have received a raise in only one of the nine years she has worked there, and the Court took judicial notice of the State's budget problems that make future substantial increase in state salaries unlikely. The Debtor also testified that even if she were somehow to find the time and money in order to advance her education, the earning of a masters degree would only increase her salary by $40 per month.

The Debtor's living expenses are extremely frugal. She sold her family home to reduce living expenses and currently resides in a rental home for a rent of $895 per month. All of her regular monthly expenses appear to be frugal, including her car payment, telephone, utilities, basic cable, car insurance, child care expenses, food, clothing, transportation, and vacation and grooming. Texas introduced no evidence to the contrary. In addition, the Court noted that her monthly expenses contained no amounts for contingencies nor for uncovered medical care. At closing argument, the Debtor indicated the amount of $50 to $75 per month that she identified as "vacation/grooming" was also intended to include uncovered medical expenses. The Court also notes there is no amount reserved for internet service, subscriptions or entertainment.

After deducting the budgeted expenses from her net take-home pay, the difference is only approximately $85.

Texas introduced no affirmative evidence that any of these expenses was excessive or not reasonably necessary for a minimal standard of living for the Debtor and her dependents. On cross-examination, Texas did establish that some of the child care costs are sometimes borne by the Debtor's ex-husband, and that she may not regularly owe additional taxes of $1,200 per year in excess of withholding, which the Debtor disputed. Texas also established that some amounts that are withheld from the Debtor's gross pay may not be mandatory, but the Court finds and concludes these amounts are all *de minimis* and in any event the protections they provide are part of a minimal standard of living.

The Debtor is a single mother raising two children. The daughter, although 20, has only a GED degree and apparently lacks any skills or training with which she could earn a sufficient income to contribute substantially to household expenses. The son is only 11 so it will be many years before he can become self-sufficient. Moreover, he is a good student who probably should obtain a college education. The Debtor hopes he will attend a community college for two years before going to a university, and that he may obtain an athletic scholarship to cover such expenses, but the Court may take judicial notice that students who earn such full athletic scholarship are undoubtedly a very small percentage of the 11 year olds who hope for them. Although both parents may have to contribute to the son's future college education, apparently neither of them has set aside any funds for that purpose; in any

event the Debtor's budget does not so provide.

### The *Brunner* Test is Satisfied

■ The Ninth Circuit has adopted the *Brunner* test for discharge of student loans.[1] This test requires the debtor to prove: (1) that she cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to exist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith effort to repay the loans.

■ As noted above, Texas essentially conceded that the Debtor had demonstrated the third prong, and in any event the Court so finds based upon her admirable repayment record leading up to shortly before the filing for bankruptcy.

■ Although many cases seem to assume that the second prong requires the showing of either extraordinary expenses or a mental or physical handicap that uniquely depresses the debtor's earning capacity, the Ninth Circuit Bankruptcy Appellate Panel has recently clarified that the second prong merely requires the demonstration of "any circumstances, beyond the mere current inability to pay, that show that the inability to pay is likely to persist for a significant portion of the repayment period."[2] That opinion went on to hold that the second prong could be established, as it was in that case, by "evidence that [the debtor] had 'maxed out' in her career."[3]

Based on the evidence presented at trial, this Court concludes that the Debtor demonstrated she has maxed out her career. She used the education loans to obtain a college degree, and she is efficiently using that education and degree precisely in the field where it is most useful, working for the State Department of Child Protective Services. The Court may take judicial notice that Arizona's Child Protective Services is widely regarded as being in a crisis, largely because the highly trained workers in the field are woefully underpaid and overworked. This does not suggest, however, that there is any alternative field in which this Debtor could earn a greater income, nor that she could utilize her education in any way to earn a higher income. Indeed, Texas presented no evidence, either affirmatively or by cross-examination, suggesting otherwise.

As noted above, the only suggestion Texas made that is relevant to the second prong is that the Debtor's child care obligations might not continue indefinitely, either because the ex-husband might provide greater support or because either child might ultimately gain greater self sufficiency. There is, however, no real evidence that those events are likely to occur. Given the likelihood that the Debtor's son should attend college, it appears to the Court that it is far more likely that the Debtor's child care expenses are likely to include college tuition and living expenses, and are therefore likely to increase substantially over the next ten years. Although Texas' evidence did not establish what is the applicable repayment period, the Court concludes that the preponderance of the evidence demonstrates that the

1. *United Student Aid Funds, Inc. v. Pena (In re Pena)*, 155 F.3d 1108, 1112 (9th Cir.1998), citing *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2nd Cir. 1987).

2. *Nys v. Educ. Credit Mgmt. Corp. (In re Nys)*, 308 B.R. 436, 444 (9th Cir. BAP 2004).

3. *Id.*

Debtor's existing financial condition is likely to persist for a significant portion of the repayment period of the loans, and there is virtually no evidence that it is likely to improve materially.

■ Finally, with respect to the first prong, the Court finds and concludes that the Debtor cannot maintain, based on her current income and expenses, a minimal standard of living for herself and her dependents if forced to repay the loans. In particular, the Court finds that the Debtor's current expenditures provide her with only a minimal standard of living for herself and her dependents. At best, this means that there is approximately only $85 per month in available disposable income.

While it is possible *Brunner* intended to impose a more austere lifestyle than that contemplated by the disposable income test of Code § 1325(b),[4] the Court notes that the amounts the Debtor has budgeted for utilities, clothing and transportation are substantially below what the Arizona Chapter 13 Trustees' Guidelines[5] suggest is appropriate for those categories.[6] The Debtor's rent at $895 per month is less than the Guidelines' 35% of gross income, which would calculate to $1,053 per month. The Debtor's monthly car payment of $330 is less than the Guidelines' suggested $450.

The Debtor's food budget of $300 is substantially below the Guidelines' suggested $585 for a single adult with two children. The Debtor's budget of $50—$75 for "vacation/grooming" and $40 for basic cable, combined, are substantially below the Trustee Guidelines' suggested $150 for recreation, periodicals and cable combined. The Debtor's budget leaves nothing for uncovered medical and drug expenses, for which the Trustee Guidelines permit up to $50 per month where there is insurance and no unusual medical problems. The net difference between Debtor's budgeted income and expenses is $87, which is less than the $90 the Trustee Guidelines suggest for miscellaneous and contingency expenses, for which the Debtor's budget provides nothing. Such an approximate amount for contingencies has been held to be appropriate for § 1325(b),[7] especially when the balance of the budget is quite austere, as it is here.

The Court therefore finds and concludes that the first *Brunner* prong has been satisfied.

### *Saxman* Does Not Require Bankruptcy Courts to Consider Partial Discharge

■ The Ninth Circuit has held that once the debtor has demonstrated the requisite undue hardship by satisfying all

---

4. For purposes of confirming a Chapter 13 plan over the objection of a trustee or creditor, 11 U.S.C. § 1325(b)(2) defines "disposable income" as "income which is received by the debtor and which is not reasonably necessary to be expended ... for the maintenance or support of the debtor or a dependent of the debtor ...." Although the Court is not aware of any case law expressly so holding, this definition seems impose a standard essentially identical to the "minimal standard of living" required by *Brunner* and *Pena*. The Court is aware that some student loan discharge cases refer to federal poverty standards, but they cite no basis for doing so. Although "undue hardship" is not defined in the Bankruptcy Code, it makes more sense to adopt a standard found elsewhere in the Code, that serves a very similar purpose, rather than one that bears no known relationship to the Code or discharge issues.

5. Available at http://www.maney13trustee.com/trguidelines11–03.pdf

6. The Debtor's budget is $235 for utilities, $100 for clothing and $225 for transportation and car insurance. The Arizona Chapter 13 Trustees' Guidelines for those categories are $388, $150 (for a family of three) and $240, respectively.

7. *In re Greer*, 60 B.R. 547, 553 (Bankr. C.D.Cal.1986).

three prongs of the *Brunner* test, the Bankruptcy Court nevertheless has equitable power under Code § 105(a) to discharge only part of the debt.[8] Texas here requests that if the Court finds an undue hardship in repayment of the entire debt, that the Court grant only a partial discharge and find that the Debtor can pay $140 per month toward a reduced loan obligation.

*Saxman* did not establish that it is the Court's duty to determine whether a partial discharge would alleviate the undue hardship, either in every case or even upon request of the creditor. This is because the Bankruptcy Court in *Saxman* had indicated that it would have granted only a partial discharge if it were permitted to do so by statute or case law. The Ninth Circuit decision therefore merely established that a bankruptcy court *may* do so if it finds it appropriate, but does not require a bankruptcy court to do so, even if faced with a request for partial discharge.

If *Saxman* merely grants to bankruptcy courts the discretion to consider whether a partial discharge would be appropriate, but does not require it, this Court would decline to accept the invitation, at least on these facts.[9] It is one thing for a Court to determine that payment of a certain amount of debt would or would not impose an undue hardship. It is entirely another matter to ask the Court to establish exactly how much debt could be paid without creating an undue hardship. This would put the Court into the position of micromanaging the debtor's lifestyle, determining precisely the amount that should be spent each month on variables such as food, clothing, cable television, recreation, subscriptions, retirement savings and grooming. Indeed, the Court could even become involved in adjusting what might normally be considered fixed expenses, such as by requiring the debtor to move to a less expensive home or drive a less expensive car, or even by requiring a reduction in utility expenses by insisting that the debtor adjust air conditioning to maintain the house at 80 degrees during Arizona's hot summers.

Such determinations would impose on the court a much more intrusive role than the court necessarily plays in resolving disposable income disputes for purposes of § 1325(b). Such disposable income determinations are usually made only when the Chapter 13 trustee objects, and that objection usually identifies precisely which monthly expense the trustee believes to be excessive. The Court is therefore in a position to determine whether a specified amount is excessive or not, rather than determining for itself exactly how much should be spent. This also means that the judgment of how much should be spent for each category comes, at least in the first instance, from the trustee rather than the Court. Chapter 13 trustees have far more experience with family lifestyle spending decisions than do bankruptcy judges, who only resolve the rare disputes that are brought before them. Chapter 13 trustees' disposable income decisions are akin to Chapter 11 trustees exercising reasonable business judgment. In that context,

---

**8.** *In re Saxman v. Educ. Credit Mgmt. Corp. (In re Saxman)*, 325 F.3d 1168, 1173–75 (9th Cir.2003).

**9.** The issue may be different if there is more than one student loan at issue. Here, however, all of the student loans have previously been consolidated. For excellent analyses of the difficulties and ambiguities the partial dis-charge option can create for bankruptcy courts, either with single or multiple student loans, *see Mason v. Help Servs. Group, Inc. (In re Mason)*, 303 B.R. 459 (Bankr.D.Idaho 2004), *aff'd*, 315 B.R. 554 (9th Cir. BAP 2004), and Madeleine Wanslee, *Ninth Circuit Embraces Partial Discharge of Student Loans*, NORTON BANKR.L. ADVISER, Aug. 2003, at 6, 8.

the case law is clear that bankruptcy courts should not supplant the trustees' business judgments, but rather merely should determine whether the trustee has exercised appropriate business judgment.[10] Yet if bankruptcy courts were required to determine how much of a partial discharge should be granted, they have to exercise a kind of family business judgment in an adversary context without even the recommendation of a neutral third party such as a trustee. Such a role would be contrary to one· of the principal reforms accomplished by the Bankruptcy Code, which was to remove bankruptcy judges from administrative functions and limit them to the proper judicial role of resolving disputes.[11]

This Court therefore concludes that *Saxman* does not impose on bankruptcy courts an obligation to determine what amount of partial discharge would not pose an undue hardship.

**10.** *Robertson v. Pierce (In re Chi–Feng Huang),* 23 B.R. 798 (9th Cir. BAP 1987) (adopting the business judgment rule for court approval of trustee's motion to reject an executory contract). *See In re Dalen,* 259 B.R. 586 (Bankr. W.D.Mich.2001) (extensive analysis of the role of the court in approving trustees' settlements, including application of the business judgment rule).

**11.** This reform was based largely upon the recommendation of the Bankruptcy Commission, which concluded that "making an individual [bankruptcy judge] responsible for conduct of both administrative and judicial aspects of a bankruptcy case is incompatible with the proper performance of the judicial function." Report of the Commission on the Bankruptcy Laws of the United States, Part 1, at 93, H.Doc. # 93–137, 93d Cong, First Session (1973). For that reason, "The Commission accordingly recommends that the bankruptcy judges be removed from the administration of bankrupt estates and be restricted to the performance of essentially judicial functions, that is, primarily to the resolution of disputes or issues involving adversary parties and matters appropriate for judicial determination." *Id.* at 94. Many provisions of the Bankruptcy Code reflect

## Creditors Should Propose and Prove the Amount of Partial Discharge that Would Not Impose Undue Hardship

■ At most, *Saxman* and the procedural reforms of the Bankruptcy Code mean that if a creditor seeks a partial discharge, it should take a position asserting exactly what amount of debt it contends would not pose an undue hardship, as Texas has done here. The court would then merely need to determine whether the creditor has carried the burden of proof that that amount of debt does not impose an undue hardship.[12] Such a procedure would allow the court to confine itself to resolving discrete disputes rather than deciding administrative matters.

■ Nevertheless, even if the Court were required to determine whether and what amount of partial discharge is appropriate, and even if the Debtor retained the

Congress' adoption of that basic principle, and nothing in the language of § 523(a)(8) suggests a departure from that principle. Because the courts, rather than Congress, have created the partial discharge exception to the language of § 523(a)(8), this Court believes that to the maximum extent possible the procedure for applying such exception should be consistent with the principle that bankruptcy courts should decide adversary proceedings simply by ruling in favor of or against a party, rather than by itself determining the appropriate outcome for the situation.

**12.** Because the partial discharge is in effect a case-law exception to the undue hardship provision of Code § 523(a)(8) (which is already an exception to an exception), it seems appropriate that the burden of proof should be placed on the party who seeks to demonstrate an exception from statutory language. *Saxman,* of course, holds that before the partial discharge may even be considered the debtor must first have carried her burden of proof in establishing the undue hardship if required to repay the entire debt.

burden of proof as to partial discharge, on these facts the Court finds and concludes that no amount of partial discharge could alleviate the undue hardship. As noted above, the Court finds that the Debtor's budget would not permit any amount to be paid on the student loans without reducing the Debtor's already minimal lifestyle. Texas has certainly not demonstrated that there would be no undue hardship for the Debtor to pay $140 per month to satisfy the remaining balance due after the partial discharge that Texas suggests.

### Conclusion

For the foregoing reasons, the Court finds and concludes that excepting the Texas debt from discharge would impose an undue hardship on this Debtor and her dependents, that the amount of partial discharge proposed by Texas would also impose an undue hardship on the Debtor and her dependents, and that such undue hardship would continue to exist if any portion of the Texas debt were not discharged.

The foregoing constitutes findings of fact and conclusions of law. The Court will enter a separate judgment discharging this Texas student loan debt in its entirety.