**In re Brett Michael CARNDUFF and Janeth Rey Carnduff, Debtors.**

**Brett Michael Carnduff; Janeth Rey Carnduff, Appellants,**

v.

**United States Department of Education, Appellee.**

**BAP No. WW–06–1200–MoSPa.**
**Bankruptcy No. 05–13455–SJS.**
**Adversary No. A05–01201–SJS.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted on Nov. 16, 2006.

Filed March 30, 2007.

---

made good faith efforts to repay their loans, the bankruptcy court held that it could not discharge any of their student loans under Section 523(a)(8)[1] because their earning capacity should improve in the future. We REVERSE and REMAND.

We publish to emphasize that the bankruptcy court has the power to grant a partial discharge of student loans even when the debtor's earning capacity is expected to improve, if that improvement will be insufficient for the debtor to pay the full balance due without an undue hardship. However, in that event, the burden of proof remains with the debtor to establish undue hardship as to any portion of the debt to be discharged.

Richard D. Granvold, Esq., Law Offices of Richard D. Granvold, P.S., Federal Way, WA, for Appellants.

Kristin B. Johnson, Esq., United States Attorney, Seattle, WA, for Appellee.

Before: MONTALI, SMITH and PAPPAS, Bankruptcy Judges.

## OPINION

MONTALI, Bankruptcy Judge.

The bankruptcy court found that Brett Michael Carnduff ("Brett") and Janeth Rey Carnduff ("Janeth") ("Debtors") will never be able to pay their student loan debt of over $350,000 unless one or both of them "wins the lottery." Nevertheless, without deciding whether Debtors have

## I. FACTS AND PARTIES' CONTENTIONS

Each Debtor started off obtaining one degree and later switched fields and obtained one or more other degrees. Both attended Andrews University in Michigan, a private school ("Andrews"). Brett attended for about eight years and Janeth for nine, including some part-time enrollment.

In 2005, shortly after Brett obtained his last degree, Debtors filed their joint, voluntary Chapter 7 bankruptcy petition (Bk. No. 05–13455–SJS) and thereafter filed a "Complaint to Determine Dischargeability of A Debt (Student Loans)" (Adv. No. A05–01201–SJS) which named as defendants four private entities and the United States Department of Education (the "Government"). A default judgment was entered against all of the private entities

---

1. Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9036, as enacted and promulgated prior to the effective date of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. 109–8, 119 Stat. 23 ("BAPCPA"), because the case from which this appeal arises was filed before its effective date (generally October 17, 2005).

discharging over $215,000 of Debtors' student loan debt.

Debtors' remaining student loans are owed to the Government. Brett owed $190,872.06 and Janeth owed $168,872.98 as of the date of trial on January 31, 2006. The bankruptcy court found that Debtors' combined take-home pay is about $5,111 per month. It made no findings as to Debtors' expenses, but the Government concedes that Brett and Janeth cannot make the payments under their current ten-year repayment plan, which Debtors calculate at $2,138.59 per month for Brett and $1,889.79 per month for Janeth.

The Government argues that Debtors' financial difficulty is temporary. Debtors are "fresh out of school," have not "even started repaying the debt," have "25 years of working left, both of them," and, the Government argues, it "should at least be given the benefit of looking at their earning capacity for a few years." Transcript, January 31, 2006, pp. 155:10–12, 157:14, 157:23–24. Debtors testified that their earning capacity is limited in their chosen fields, that they cannot find more remunerative work in other fields, and that their financial circumstances will worsen because they have recently divorced and because for family reasons Brett can no longer move around the country for contract work and must accept regular employment at lower pay. The Government responded at trial that Debtors are not presently maximizing their income, that their income will increase in the future, and that meanwhile Debtors can use deferments or forbearances and can make payments consistent with their financial circumstances under an income contingent repayment plan ("ICRP"). The Government's interrogatory responses, admitted at trial, describe plans with monthly payments ranging from $823.03 to $2,141.66 depending on assumptions about Debtors'

future income, interest rates, and repayment periods which can range from the current 10 years up to 25 or 30 years. Debtors do not dispute that they may qualify for an ICRP or other repayment plan but their attorney argued that they cannot afford even $200 per month. He also argued that, although Debtors might be eligible for debt forgiveness at the end of an ICRP or other plan, that would result in "a huge tax bite." Transcript, January 31, 2006, p. 149:17–21.

Brett is healthy and was 34 years old as of the date of trial. He has a bachelor's degree in technology in computer imaging with an emphasis in business and communications. Brett testified that he has not been able to get a job using that degree because his degree was awarded in 1997 and the relevant software programs are now completely different.

In addition, Brett holds a master's degree in developmental and educational psychology with an emphasis on school psychology. He intended to obtain a Ph.D. in that field but testified that as a result of a loan consolidation program he lost funding to complete his Ph.D. Instead he obtained an Educational Specialist Degree which he describes as between a master's and a Ph.D. Brett testified that because he does not have a Ph.D. he is not qualified for any work other than being a school psychologist except for teaching at a community college which would pay "much less" than his current employment. As of the date of trial he was earning a salary of somewhere between $45,000 and $50,000 per year.

Brett does not expect his future pay to increase by much. According to the pay scale set by the State of Washington, Brett testified, "I'm looking at $58,000 after 20 years of experience." Transcript, January 31, 2006, p. 37:24–25. He added that Washington is "one of the highest paying

states in the United States for my job." *Id.* p. 89:14–15.

Janeth is healthy and was 36 years old as of the date of trial. She has a bachelor of science degree with a major in medical technology but testified that she cannot be employed in that field because she never passed the test for certification as a medical technologist. She could have taken the test a third time within two years after graduation. If she failed again, though, she would have had to go back to school for about one and a half years. Even if she had passed the test she testified that she would only have earned $16 per hour as a medical technologist, which is less than what she makes now as an administrative assistant. Transcript, January 31, 2006, pp. 115:23–116:3, 119:9–120:14, 125:25–126:8. Instead of taking the test again Janeth stayed home with Debtors' two children for three years without a paying job and then went back to graduate school on a part-time basis for four years.

Janeth earned a master's degree in social work with an emphasis in community service. She testified, "I don't have an internship, so that's why I can't get a job right now." Transcript, January 31, 2006, p. 117:11–12. "[N]obody will hire me, because you need at least five years of experience" and "I don't have any … not even [an] internship." *Id.* p. 128:1–7.

Janeth is presently employed as an administrative assistant earning $16.49 per hour. She works four days a week, typically for 32 hours, and takes Fridays off for religious reasons. She has the option to work for ten hours on the four days that she works but she chooses not to do so, both so that she can spend more time with her children and because the added child care expenses of working longer hours would exceed her added income. Transcript, January 31, 2006, pp. 109:5–110:15, 131:2–7, 136:10–20.

Janeth testified that she is unable to "move up" at work and that she is not qualified to be an administrator because without an MBA degree she is only qualified to "work for a non-profit, like Red Cross Community Service." Transcript, January 31, 2006, pp. 116:6–17, 127:14–18. At a non-profit she "can do grant writing, and it will be $3 less [per hour] than what I'm making now." *Id.* p. 118:9–12. In 2005 she did some house cleaning for her sister to make some extra money. She has sent out about ten resumes to employers without having received any job offers.

Debtors have been divorced from each other once before and they divorced again after filing their bankruptcy petition. As of the date of trial they were living together but the bankruptcy court assumed that they would live separately at some point and that this will increase their expenses.

The Government did not put on any witnesses but argued that some expenses, such as the children's private school and tithing to their church, are self-imposed and that Debtors are really just choosing to spend all of their take home pay. The Government added that Debtors had chosen to stay in college for eight years at a private institution with very high tuition and had then chosen to pay private lenders rather than the Government because Brett's mother had co-signed many of those loans. The Government's attorney also argued:

> I know that the plaintiff's counsel has said, well, the Government hasn't shown [that Debtors] will be making, you know, huge salaries. It's not the Government's burden. It's the plaintiff's burden to show that there is some barrier on their path to recovery that's more than just a current inability to make the payments. It appears that they have a current inability to make the payments.

But they haven't shown anything that's going to make that persist for 25 years. Transcript, January 31, 2006, p. 158:1–10.

Debtors' attorney focused, both in his trial brief and in oral argument at trial, on obtaining a complete discharge of Debtors' student loans but in the alternative he sought a partial discharge. At the end of trial the bankruptcy court asked the Government's counsel, "What about the idea of a partial discharge?" She responded:

> I'm aware that the Court can do it. I would ask that the Court not entertain that idea now, simply because the Government should be given the benefit of seeing at least some earning capacity. Right now we have nothing. We are just supposed to take it on their word that they're not going to be able to make much more. But they just started. So if we get to a point where they've shown that they've tried and that they can't do it, even given all the, you know, leniencies the [D]epartment [of Education] is willing to do, then I'd say it's something to consider for the Court. But we'd ask that you not consider it now, given the timing and how new this is.

Transcript, January 31, 2006, pp. 158:13–159:2.

The bankruptcy court announced its ruling orally at a hearing on March 16, 2006. It concluded that Debtors could never repay the full amount of their student loan debt to the Government but that they are not entitled to a full or partial discharge of the debt because, based on the bankruptcy court's own experience, their earning ca-

pacity should improve in the future. Transcript, March 16, 2006, pp. 6:16–8:1.

On May 19, 2006, the bankruptcy court entered a judgment that the entire amounts of Debtors' student loan obligations to the Government are not dischargeable in bankruptcy. Debtors filed a timely notice of appeal.

## II. ISSUE

Are Debtors entitled to a full or partial discharge of their student loan debt to the Government?[2]

## III. STANDARDS OF REVIEW

 "We review de novo the bankruptcy court's application of the legal standard in determining whether a student loan debt is dischargeable as an undue hardship." *In re Rifino*, 245 F.3d 1083, 1087 (9th Cir.2001) (citation omitted). We review the bankruptcy court's findings of fact for clear error. *In re Pena*, 155 F.3d 1108, 1110 (9th Cir.1998).

## IV. DISCUSSION

Section 523(a)(8) provides in full:

§ 523. *Exceptions to discharge*

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

\* \* \*

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or

---

**2.** Despite their separate outstanding student loans, we treat Debtors as a single unit, even though they have divorced, because they were living together at the time of trial. Further, the bankruptcy court considered at least their current income and expenses together, and the parties have not argued on appeal that this was error. We express no opinion whether the bankruptcy court should treat Debtors separately or together, should do so only for some purposes or for all purposes, or should consider any post-trial changes in Debtors' living arrangements or other circumstances. Those issues can be addressed on remand as appropriate.

nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an *undue hardship* on the debtor and the debtor's dependents[.]

11 U.S.C. § 523(a)(8) (emphasis added).

Neither the Bankruptcy Code nor the legislative history of Section 523(a)(8) defines "undue hardship."[3] Case law has held that it is something more than "garden-variety hardship." *Pena,* 155 F.3d at 1111 (citation omitted). The Ninth Circuit has adopted the three-prong test of *Brunner v. N.Y. State Higher Educ. Servs. Corp.,* 831 F.2d 395 (2d Cir.1987):

First, the debtor must establish "that she cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans." *Brunner,* 831 F.2d at 396....

Second, the debtor must show "that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans." *Brunner,* 831 F.2d at 396. This second prong is intended to effect "the clear congressional intent exhibited in section 523(a)(8) to make the discharge of stu-dent loans more difficult than that of other nonexcepted debt." *Id.*

The third prong requires "that the debtor has made good faith efforts to repay the loans...." *Brunner,* 831 F.2d at 396. The "good faith" requirement fulfills the purpose behind the adoption of section 523(a)(8).... Section 523(a)(8) was a response to "a 'rising incidence of consumer bankruptcies of former students motivated primarily to avoid payment of education loan debts.'" *Id* .... This section was intended to "forestall students ... from abusing the bankruptcy system." *Id.*

*Pena,* 155 F.3d at 1111 (some citations omitted).

The debtor has the burden to prove all three prongs of the *Brunner* test. If the debtor fails to prove any one of the three prongs then the loan will not be discharged. *In re Nys,* 308 B.R. 436, 441– 42 (9th Cir. BAP 2004), *aff'd,* 446 F.3d 938 (9th Cir.2006).

In measuring income and expenses the test is whether it would be " 'unconscionable' to require the debtor to take steps to earn more income or reduce her expenses" in order to make payments under a given repayment schedule. *In re Birrane,* 287 B.R. 490, 495 (9th Cir. BAP 2002) (quoting *In re Nascimento,* 241 B.R. 440, 445 (9th Cir. BAP 1999)).

---

3. Paragraph (8) of Section 523(a) has been amended by BAPCPA. As stated in footnote 1 above that amendment does not apply to this case, but we note that Congress has not included any definition of "undue hardship" in the amended statute:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
\* \* \*
(8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for—

(A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or
(ii) an obligation to repay funds received as an *educational benefit, scholarship,* or stipend; or
(B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual[.]
11 U.S.C. § 523(a)(8) (as amended by BAPCPA).

■ A partial discharge of student loan debt is also permissible. *In re Saxman*, 325 F.3d 1168 (9th Cir.2003). Either the debtor or the lender may seek a partial discharge. Typically the debtor presents evidence of current income and expenses and any other relevant facts under *Brunner* and the lender presents any contrary evidence. The bankruptcy court then determines, based on the parties' evidence, whether the debtor can afford to pay all, part, or none of the student loan debt without undue hardship. *Id.* at 1173–75. The case before us is somewhat different because the bankruptcy court drew from its own experience. Also, although it was persuaded that Debtors could never repay the loan in full, it found that Debtors' earning capacity should improve in the future and then it apparently concluded that it had no power to grant a partial discharge. Before considering *Saxman* and the possibility of a partial discharge, we turn to the *Brunner* factors.

### A. *The first prong of Brunner*

Debtors have the burden to prove that they "cannot maintain, based on *current* income and expenses, a 'minimal' standard of living for [themselves] and [their] dependents if forced to repay the loans." *Brunner*, 831 F.2d at 396 (emphasis added). Debtors argue that they cannot presently afford any payments at all. The Government challenges some expenses. Debtors defend those expenses and claim that the bankruptcy court miscalculated their income.

We need not resolve these disputes. Even with every adjustment in the Government's favor there would be only a few hundred dollars left over every month after deducting Debtors' current expenses from their current income. The evidence does not show that such a modest increase in Debtors' income would be adequate to fully amortize the entire amount of their student loan debt.

### B. *The second prong of Brunner*

■ This prong, which examines future finances, has generated some confusion. Its purpose, according to the Second Circuit in *Brunner*, is to test whether the hardship presented is truly "undue." *Brunner*, 831 F.2d at 396. Therefore, in addition to a current inability to repay the debt, the debtor must show "exceptional" circumstances "strongly suggestive of continuing inability to repay over an extended period of time." *Id.* The word "exceptional" led at least one court to believe that there must be evidence of a serious illness, psychiatric problems, disability of a dependent, or similar circumstances, and not just an inability to repay. *See Nys*, 308 B.R. at 440 (quoting bankruptcy court's holding). We and the Ninth Circuit have clarified that the circumstances need be exceptional only in the sense that they demonstrate insurmountable barriers to the debtor's financial recovery and ability to repay the student loan now and for a substantial portion of the loan's repayment period. *Id.* at 444, *aff'd*, 446 F.3d at 941.

■ Another confusing aspect of the second prong is the standard of proof required. The district court in *Brunner* required a "*certainty* of hopelessness, not simply a present inability to fulfill financial commitment." *In re Brunner*, 46 B.R. 752, 755 (S.D.N.Y.1985) (emphasis added, citation omitted), *aff'd*, 831 F.2d 395. We have used the same language. *Nys*, 308 B.R. at 443. Even though this language could be interpreted to require absolute certainty that a debtor's financial situation will not improve, this is not so. Rather, only a preponderance of the evidence standard applies. What must be certain is the hopelessness—the expectation that the debtor will be unable to repay the student

loans—but predicting future finances is "problematic" and the projected dollar amounts could never be certain. *Brunner,* 831 F.2d at 396. Thus in *Nys* we equated the "certainty of hopelessness" language with the test that the Second Circuit actually adopted in *Brunner* and which we have quoted above: "exceptional circumstances, *strongly suggestive* of continuing inability to repay over an extended period of time." *Nys,* 308 B.R. at 443 (quoting *Brunner,* 831 F.2d at 396) (emphasis added). In *Nys* we also quoted with approval a leading commentator describing the standard as "preponderance of the evidence" and noting that the debtor is not required to prove his or her case "with certainty." *Nys,* 308 B.R. at 442–43 (quoting 4 *Collier on Bankruptcy* ¶ 523.14[2], at 523–100 (Alan R. Resnick and Henry J. Sommer eds., 15th ed. rev.2003)).[4]

■ Applying the above standards, *Brunner's* second prong sets a high but not impossible bar. To discharge any of their student loan debt to the Government, Debtors must prove by a preponderance of the evidence that, for a substantial portion of the loan repayment period, they would not be able to maintain even a "minimal" standard of living if forced to pay that debt.

■ In this case the bankruptcy court held that Debtors did not meet their burden to prove *Brunner's* second prong:

As to the second *Brunner* test, that is, in effect, whether the dire financial circumstances will continue throughout the repayment period of the loan, this is obviously the main issue of the case. The Government points [out] that both debtors are in their early 30's; they are healthy and well educated; their financially productive years are ahead of them; that there is no reason for the two of them to be forever stuck in a financial backwater; and that *their earning capacity should improve in the future,* particularly if they make the effort.

On this issue, in large part, I agree with the Government. I get the impression that these debtors are resigned to their present circumstances. I see no reason why they should be. As has been pointed out, they are young, they are healthy, they are well educated, and there is *no reason why their financial circumstances should not improve,* particularly when their children become of age, and provided they make the effort.

Accordingly, I conclude that the debtors have not satisfied the second prong of *Brunner* and that the student loans are not dischargeable.

Transcript, March 16, 2006, pp. 6:16–7:13 (emphasis added).

Debtors argue persuasively that the bankruptcy court applied an incorrect legal test. The issue is not whether Debtors' financial circumstances are likely to improve *at all* but whether Debtors can rebut the presumption that their income "will increase *to a point where [they] can make payments* and maintain a minimal standard of living." *Nys,* 446 F.3d at 946

---

4. The prediction of future finances is not set in stone. Nondischargeability under Section 523(a)(8) has been held not to be preclusive in a later bankruptcy case. *See In re Nash,* 446 F.3d 188, 194 (1st Cir.2006); 11 U.S.C. § 523(b) ("Notwithstanding subsection (a) of this section, a debt that was excepted from discharge under subsection … (a)(8) of this section … in a prior case concerning the debtor under this title … is dischargeable in a case under this title unless, by the terms of subsection (a) of this section, such debt is not dischargeable in the case under this title."). *See also In re Fuller,* 296 B.R. 813, 819 (Bankr.N.D.Cal.2003) (decision explicitly without prejudice because of possibility of future changes in circumstances).

(emphasis added). We interpret "payments" to mean the payments that would be required if the student loan debt at issue is not discharged. This is consistent with Ninth Circuit direction: "Undue hardship requires only a showing that the debtor will not be able to maintain a minimal standard of living now and in the future if *forced to repay her student loans*." *Id.* at 946 (emphasis added).

The bankruptcy court itself found that there is no way that Debtors can pay their student loan debts in full. After stating that Debtors' earning capacity and financial circumstances should improve in the future it stated:

> Now, having said all that, as a practical matter, it appears to me that unless one or both of these debtors wins the lottery, receives a substantial inheritance, finds a gold mine or a treasure trove in the backyard or somehow achieves wealth in some other way, that there is simply no way in which these loans will ever be repaid in full.

Transcript, March 16, 2006, pp. 7:16–7:22.

Therefore, Debtors have shown that their future income and expenses will not permit them to pay their *entire* student loan debt without undue hardship.

### C. *The third prong of Brunner*

As stated at the beginning of this opinion the bankruptcy court did not find whether Debtors have made good faith efforts to repay their loans. The bankruptcy court treated Debtors' obligations to the Government as nondischargeable regardless of whether they could prove good faith.

 Debtors imply that we should go further and decide the good faith issue, but we cannot engage in factfinding. That is for the bankruptcy court on remand. *See generally In re Dolph*, 215 B.R. 832, 837–38 (6th Cir. BAP 1998) (remanding for *Brunner* analysis when factual findings were ambiguous). *Cf. In re Mason*, 464 F.3d 878 (9th Cir.2006) (reversing good faith determination based on subsidiary facts found by bankruptcy court).

### D. *Partial discharge*

This case seems to cry out for a partial discharge. Debtors owe the Government over $350,000 and from Debtors' evidence the bankruptcy court found that there is "no way in which these loans will ever be repaid in full." Transcript, March 16, 2006, pp. 6:16–7:22. By definition, then, forcing them to try paying over $350,000 would seem to be an undue hardship (assuming Debtors' good faith, for purposes of discussion only). On the other hand, the bankruptcy court found that Debtors' finances "should improve in the future," *id.*, which implies that it thought Debtors will be able eventually to pay some meaningful portion of their student loan debt. If so, then Debtors might be unjustly rewarded and the Government unjustly punished if the *entire* student loan debt were to be discharged simply because it is so large that Debtors cannot pay it in full. The middle ground is a partial discharge.

The bankruptcy court nevertheless believed that it was prohibited from granting a partial discharge in this case:

> I seriously considered granting a partial discharge. However, as I said from the start, in *In re Pena*, which adopts *Brunner*, that is the law in this circuit, and I am bound to follow it.

Transcript, March 16, 2006, pp. 7:22–8:1.

 We do not interpret *Pena* and *Brunner* as prohibiting a partial discharge in this case. The Ninth Circuit has rejected the view that Section 523(a)(8) mandates an "all-or-nothing" approach to nondischargeability of student loan debt.

*Saxman,* 325 F.3d at 1173. One problem with the all-or-nothing approach is that it renders a "large debt more likely of discharge" thereby rewarding "irresponsible borrowing" and conversely punishing debtors who either borrow less or pay down their student loans before filing their bankruptcy petition. *In re Myrvang,* 232 F.3d 1116, 1123 (9th Cir.2000) (discussing Section 523(a)(15) and quoting *In re Brown,* 239 B.R. 204, 211) (S.D.Cal.1999)); *Saxman,* 325 F.3d at 1174 (applying *Myrvang* reasoning to Section 523(a)(8)).

*Saxman* held that bankruptcy courts have the equitable power to grant a partial discharge. 325 F.3d at 1173–75. We do not interpret *Saxman* to mean that bankruptcy courts are required in every instance to consider a partial discharge, but they have the discretion to do so. *See In re Stewart–Johnson,* 319 B.R. 192, 198 (Bankr.D.Ariz.2005). *Contra In re Bossardet,* 336 B.R. 451, 457 (Bankr.D.Ariz. 2005). The bankruptcy court in this case thought that it lacked such discretion, which is an error of law.

*Saxman* required that all three prongs of *Brunner* be satisfied in partial discharge cases, as a curb on unbounded equitable powers. The Ninth Circuit rejected authority that "even if a debtor fails to establish his or her burden under § 523(a)(8) of showing undue hardship, bankruptcy courts can still partially discharge educational loans pursuant to § 105(a)." *Saxman,* 325 F.3d at 1174 (citing *In re Hornsby,* 144 F.3d 433, 439 (6th Cir.1998)). The problem with permitting a partial discharge "without first finding that the *Brunner* test has been satisfied is that the equitably-based principle of partial discharge would then have the very real potential to eviscerate the statutorily-based undue hardship provision." *Saxman,* 325 F.3d at 1174. The court concluded:

A debtor who wishes to obtain a discharge of his student loans *must therefore meet the requirements of § 523(a)(8) as to the portion of the debt to be discharged* before that portion of his or her debt can be discharged.

*Saxman,* 325 F.3d at 1174 (emphasis added).

### 1. *Burden of proof*

As we read the emphasized language just quoted, the burden of proof remains with the student loan debtor in partial discharge cases. It is the debtor's burden to establish the portion of the debt to be discharged—"the portion that results in undue hardship." *Id.* at 1175 (quoting lower court).

Undue hardship is tested by the three prongs of *Brunner,* regardless whether at the end of trial the bankruptcy court is considering a full or a partial discharge. On the first prong the debtor presents evidence of "current income and expenses" and the bankruptcy court determines whether, consistent with a "minimal" standard of living, the debtor currently can pay some, all, or none of the student loan debt. *Pena,* 155 F.3d at 1111 (quoting *Brunner,* 831 F.2d at 396). On the second prong the debtor presents evidence of additional circumstances indicating that "this state of affairs is likely to persist for a significant portion of the repayment period of the student loans." *Id.* Finally, the debtor presents evidence of "good faith efforts to repay the loans." *Id.* If the debtor does not make a prima facie showing of these things, or if the lender rebuts that showing, then the debtor is not entitled to even a partial discharge.

There is some contrary authority. *Stewart–Johnson* holds that burden of proof shifts to the creditor when partial discharge is at issue:

At most, *Saxman* and the procedural reforms of the Bankruptcy Code [which generally removed judges from administrative functions and limited them to resolving disputes] mean that if a creditor seeks a partial discharge, it should take a position asserting exactly what amount of debt it contends would not pose an undue hardship.... The court would then merely need to determine whether the creditor has carried the burden of proof that that amount of debt does not impose an undue hardship.

*Stewart–Johnson*, 319 B.R. at 199 (footnote omitted). *See also Bossardet*, 336 B.R. at 457 (agreeing with *Stewart–Johnson* on shifting burden of proof).

We disagree. *Stewart–Johnson* does not distinguish the language that we have quoted from *Saxman*, which we interpret as placing the ultimate burden of proof squarely on the debtor. Shifting the burden of proof would also cause the very problem that *Saxman* sought to avoid. It would reward debtors with larger student loan debts. Debtors in this case were able to prove that they could never pay their full debt because it is so large—over $350,000—so they would have the benefit of shifting the burden of proof whereas a debtor who borrowed less would not have that benefit.

We are mindful of, but not persuaded by, the countervailing problems that *Stewart–Johnson* sought to avoid:

It is one thing for a Court to determine that payment of a certain amount of debt would or would not impose an undue hardship. It is entirely another matter to ask the Court to establish exactly how much debt could be paid without creating an undue hardship. This would put the Court into the position of micro-managing the debtor's lifestyle, determining precisely the amount that should be spent each month on variables such as food, clothing, cable television, recreation, subscriptions, retirement savings and grooming. Indeed, the Court could even become involved in adjusting what might normally be considered fixed expenses, such as by requiring the debtor to move to a less expensive home....

Such determinations would impose on the court a much more intrusive role than the court necessarily plays in resolving disposable income disputes for purposes of § 1325(b). Such disposable income determinations are usually made only when the Chapter 13 trustee objects.... Chapter 13 trustees have far more experience with family lifestyle spending decisions than do bankruptcy judges.... [B]ankruptcy courts should not supplant the trustees' business judgments, but rather merely should determine whether the trustee has exercised appropriate business judgment. Yet if bankruptcy courts were required to determine how much of a partial discharge should be granted, they have to exercise a kind of family business judgment in an adversary context without even the recommendation of a neutral third party such as a trustee. Such a role would be contrary to one of the principal reforms accomplished by the Bankruptcy Code, which was to remove bankruptcy judges from administrative functions and limit them to the proper judicial role of resolving disputes.

*Stewart–Johnson*, 319 B.R. at 198–99 (footnotes omitted).

Although these are legitimate concerns, the bankruptcy court faces the same potential problem of micro-management regardless who has the burden of proof. Congress has not defined "undue hardship" so the courts must determine how much hardship is undue. Perhaps the bankruptcy court can obtain guidance from

the disposable income test of Chapter 13 (11 U.S.C. § 1325(b)),[5] the provisions of BAPCPA regarding bankruptcy "abuse" (*e.g.*, 11 U.S.C. § 707(b)), or expert testimony, but one way or another it must decide the issue that Congress created.

Another reason advanced by *Stewart–Johnson* for shifting the burden of proof is based on its reading of Section 523(a)(8):

> Because the partial discharge is in effect a case-law exception to the undue hardship provision of Code § 523(a)(8) (which is already an exception to an exception), it seems appropriate that the burden of proof should be placed on the party who seeks to demonstrate an exception from statutory language.

*Stewart–Johnson*, 319 B.R. at 199 n. 12.

We disagree with the premise that Section 523(a)(8) favors an all-or-nothing approach and that a partial discharge is therefore an "exception" to the statutory language. As we interpret *Saxman*, it held the opposite. It held that "such debt" in Section 523(a)(8) should not be "interpreted as evincing a congressional intent that student debt either be completely discharged or not at all." 325 F.3d at 1173. It also held that even if "such debt" refers to the entire student loan debt, Section 523(a)(8) is still "silent with respect to whether the bankruptcy court may partially discharge the loan." *Id.* A partial discharge is not an exception to the statute. To the contrary, an all-or-nothing treatment "thwarts the purpose of the Bankruptcy Act." *Id.* at 1174 (quoting *Hornsby*, 144 F.3d at 439).

Section 523(a)(8) places the burden on debtors to prove that they cannot pay all of their student loan debt, or at least some portion of it, without undue hardship. Debtors have the burden to prove all three prongs of *Brunner* "as to the *portion* of the debt to be discharged." *Saxman*, 325 F.3d at 1174 (emphasis added).

### 2. *Application of the burden of proof in this case*

Debtors attempted to show that they could not pay *any* of their student loan debt without undue hardship. They argued in the alternative that they could pay only *part* of their student loan debt. Brett testified that he would earn no more than $58,000 after 20 years of experience as a school psychologist and Janeth testified that for various reasons her degrees in medical technology and social work would not generate income above her current earnings. The bankruptcy court appears to have accepted that Debtors' income potential is limited within their chosen fields, at least for the sake of argument. *See* Transcript, January 31, 2006, p. 153:17–19. If the bankruptcy court had no other concerns then it might have used Debtors' evidence to project their future income, deduct future expenses, calculate how much student loan debt Debtors could pay without undue hardship, and discharge the excess. That is not what happened. The bankruptcy court asked Debtors' counsel:

> What I want to know from you is this. Both [Debtors] seem to think their only

---

**5.** We express no view whether the disposable income test of Chapter 13 is either a permissible or a required method of assessing undue hardship under Section 523(a)(8). *Compare In re Sequeira*, 278 B.R. 861, 865 (Bankr. D.Or.2001) ("There is no reason to believe that Congress intended a harsher standard in discharge analysis" than what is required "to determine 'disposable income' in Chapter 13 cases") *with In re Fulbright*, 319 B.R. 650, 657–58 (Bankr.D.Mont.2005) ("Under § 1325, a debtor is generally not required to alter reasonable lifestyle choices" whereas "[u]nder § 523(a)(8), ... deference to a debtor's lifestyle choices is, to put it kindly, muted.") (quoting *In re Savage*, 311 B.R. 835, 840 n. 7 (1st Cir. BAP 2004)).

employment opportunities are in the field for which they have this extensive education. Why couldn't they look for employment with a better future in other fields? I mean, let's say Boeing starts hiring. Maybe you could get a good job at Boeing. Let's say that there might be an opening at Microsoft. Aren't they limiting themselves just by saying, well, I'm just trained as a school psychologist, so that's all I'm ever going to do?

Transcript, January 31, 2006, pp. 137:17–138:2.

The bankruptcy court later gave an example of someone who went to work "years ago" for Boeing "in the most menial job they had there" and worked his way up to end up making "80, $85,000 a year." *Id.* p. 143:14–22. Debtors essentially argue that this is speculation. We interpret it differently: the bankruptcy court was using an example to illustrate that it did not believe that Debtors' future earning capacity was as limited as they claimed.

 Debtors argue that the bankruptcy court was required to make actual projections in specific dollar amounts. We disagree. Debtors have the burden to show the portion of their student loan debt that they will be unable to pay without undue hardship. The bankruptcy court does not have the burden to show the opposite, let alone calculate precise dollar amounts. Debtors did attempt to meet their burden of proof but the bankruptcy court was entitled to disbelieve their evidence. *See Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

We could interpret the bankruptcy court's refusal to grant a partial discharge as an implicit ruling that Debtors did not meet their burden of proof. If Debtors did not meet their burden to prove how much their student loan debt should be reduced then, it seems to us, they are not entitled to a partial discharge. The bankruptcy court would be left with only an all-or-nothing choice. Because discharging the entire debt would be inequitable to the Government, perhaps the only alternative was to discharge none of the debt. *Cf. Hornsby,* 144 F.3d at 440 (noting various alternative approaches to partial discharge). Admittedly Debtors would be left owing more than they could ever pay, but that sometimes happens in nondischargeability cases.

But we will not affirm on this basis. The bankruptcy court appears to have made its decision not because of the burden of proof but because it thought it had no discretion to consider a partial discharge, which is an error of law. We cannot defer to the exercise of discretion that the bankruptcy court seems to have believed it did not have.

We are also concerned that the way in which the bankruptcy court drew on its own experience and rejected Debtors' contrary evidence may not have given Debtors a fair opportunity to rebut its concerns about alternative employment. The bankruptcy court first expressed its concerns *after* the close of evidence. The Government offered no evidence or even specific examples of alternative employment, although in closing argument its attorney did state, "as the Court pointed out, there are so many other things that these plaintiffs can do." Transcript, January 31, 2006, p. 154:21–22. The bankruptcy court also may have overlooked some evidence. It stated, "I don't have any evidence [that Debtors] ever tried anything out of their fields." *Id.,* pp. 137:17–138:2, 144:9–11. Debtors' counsel pointed out that Brett testified to having done some work in

sales. *Id.* at pp. 94:18–23, 144:12–13. The bankruptcy court acknowledged, "[y]eah, he did." *Id.* at p. 144:14. Debtors' counsel then added, "when you look at the evidence, they're earning what they can, the highest that they can." *Id.* at p. 144:21–22 et seq. This is an accurate summary of the only relevant evidence before the bankruptcy court—Debtors' testimony. Debtors testified that their earlier degrees were outmoded (Brett's computer imaging degree) or useless (Janeth's lack of certification as a medical technologist), that alternative employment related to their degrees would actually pay less than they presently earn (teaching at community college for Brett and working as a grant writer or medical technologist for Janeth), that they could not earn more in alternate fields, and that in order to qualify for higher paying jobs they would have to return to school and incur more student loan debt, which they cannot afford. *See, e.g.,* Transcript, January 31, 2006, pp. 44:17–23, 94:12–97:10, 122:5–8, 144:9–24. Debtors' counsel alluded to this evidence in response to the bankruptcy court's questions. *Id.,* pp. 138:12–139:9, 142:19–143:5, 144:12–24. *See generally Pena,* 155 F.3d at 1110, 1114 (when debtor's educational credential was "useless to him," bankruptcy court did not err in considering that his income was unlikely to increase as a result of his education); *Nys,* 446 F.3d at 946 & n. 7 (debtor must "present the court with circumstances that she cannot reasonably change" but "[a]t the same time, we cannot

fault the debtor for having made reasonable choices that now inhibit her ability to substantially increase her income in the future").

We recognize that Debtors' counsel could have asked the bankruptcy court to reopen the trial and reopen discovery so that he could find an expert witness to testify about Debtors' lack of prospects for greater earning power outside of their chosen fields. From the excerpts of record, however, it seems to us that Debtors had little warning that the bankruptcy court was not satisfied with the answers to its questions and would override the only evidence before it based on its own view that Debtors could earn more outside of their fields. The bankruptcy court should consider on remand whether additional procedures are required to assure that Debtors have had a fair opportunity to present rebuttal evidence.[6]

Whether or not the bankruptcy court permits the parties to present more evidence, it should articulate its reasoning regarding partial discharge. In particular it should address the burden of proof and how it has weighed the equities as permitted by *Saxman.*

### E. *Other issues*

The parties argue that various issues are grounds for reversal or affirmance. We disagree that these issues are dispositive, but some of them may need to be addressed on remand.

---

**6.** In the analogous context of fee applications, in which the bankruptcy court has a duty to raise issues even if no party in interest does so, the Ninth Circuit has cautioned that the bankruptcy court sometimes "simulates the role of an adversary, albeit to a circumscribed degree," and it should apprise parties of "the particular questions and objections it harbors" and give them "an opportunity to rebut or contest the court's conclusions." *In re Eliapo,* 468 F.3d 592, 603 (9th Cir.2006). *See*

*generally Stewart–Johnson,* 319 B.R. at 198–99 (noting problems with court exercising "a kind of family business judgment" under Section 523(a)(8)). *Cf. In re Voelkel,* 322 B.R. 138, 146–47 and n. 21 (9th Cir. BAP 2005) (even under Section 707(b), which provides for sua sponte dismissal by bankruptcy court based on its own value judgments, it should have notified debtor of issues prior to hearing).

### 1. Loan repayment period

Debtors argue that the bankruptcy court erred by assuming that their student loans would be restructured and the payment period extended. We disagree.

Debtors' only authority is a decision by "[t]his very trial court judge." *In re Hinkle*, 200 B.R. 690, 693 (Bankr.W.D.Wash. 1996). The decision in *Hinkle* holds that the court cannot "restructure" student loans in the sense that it cannot partially discharge them—a premise that has since been overruled by the Ninth Circuit. *Saxman*, 325 F.3d 1168. *Hinkle* also rejected "speculation" about repayment programs (*Hinkle*, 200 B.R. at 693 n. 2) but in this case Debtors did not dispute that some sort of repayment plan would be available to them. We believe that it was proper for the bankruptcy court to assume that they will restructure their loans to the extent they can do so. That is consistent with their obligation to act in good faith (*Nys*, 446 F.3d at 947; *Mason*, 464 F.3d at 885) and with the Ninth Circuit's instruction that, under *Brunner's* second prong, "the debtor cannot have a reasonable opportunity to improve her financial situation, yet choose not to do so." *Nys*, 446 F.3d at 946. *See also Birrane*, 287 B.R. at 495–96 nn. 3 & 5 and 500. We reject Debtors' argument, which is in essence that if they are unable to repay their student loans over a ten year period then they need not repay them at all.

### 2. Feasibility of alternative repayment plans

Debtors argue in the alternative that even if restructured payment plans are theoretically possible the bankruptcy court should not have assumed that such a plan is feasible in this case. Debtors argue that the ICRP could involve years of payments that would barely reduce principal or even be inadequate to pay accruing interest and this allegedly would ruin their credit ratings. Some repayment plans could result in debt forgiveness after 25 or 30 years, resulting in a large amount of imputed income for tax purposes. Debtors claim that the available restructuring plans would cripple them financially.

Debtors have not established that this is necessarily so. They cite three decisions in which student loans were discharged despite the debtors' refusal to enter into alternative repayment plans, but Debtors fail to mention that two of those decisions were reversed. *See In re Boykin*, 312 B.R. 915 (Bankr.M.D.Ga.2004), *rev'd*, 313 B.R. 516 (M.D.Ga.); *In re Long*, 271 B.R. 322, 332 (8th Cir. BAP 2002), *rev'd*, 322 F.3d 549 (8th Cir.2003), on *remand*, 292 B.R. 635 (8th Cir. BAP 2003) (no undue hardship, reversing bankruptcy court).

The third decision cited by Debtors recognizes that repayment plans are "not *always* a feasible option" but the issue is when they are feasible and when they are not. *In re Korhonen*, 296 B.R. 492, 496–97 (Bankr.D.Minn.2003) (emphasis added). That decision involved an unemployed, physically and psychologically impaired homeless man who "could not pay" the loan even under the repayment plan. *Id.* Debtors have not established any similar facts.

Nevertheless, the bankruptcy court may need to consider on remand whether future tax liability, negative credit ratings, or any other consequences of the available repayment plans would impose an undue hardship that requires a partial discharge of the student loan debt. *See Birrane*, 287 B.R. at 500 n. 7 (noting possibility of tax liability from forgiveness of debt); *Korhonen*, 296 B.R. at 496–97 (same); *In re Sequeira*, 278 B.R. 861, 863 n. 2 (Bankr. D.Or.2001) (same); *In re Williams*, 301 B.R. 62, 78–79 (Bankr.N.D.Cal.2003) (rejecting argument that not making use of

alternative repayment programs showed lack of good faith, when debtors calculated that they would be charged with $300,000 to $400,000 of discharge of indebtedness income on eve of their 80th birthdays).

### 3. *The Government's arguments*

The Government points out that Debtors incurred a very large amount of student loan debt—over $350,000 owed to the Government and what Brett's own declaration describes as a total amount owed to all lenders of "approximately $600,000" before the private loans were discharged. The Government objects that because Debtors chose to pay other debts and took deferments for economic hardship and other reasons they have paid the Government only $52. This may bear on Debtors' good faith, but as the bankruptcy court recognized the size of the debt cuts both ways:

> In the first place, it is difficult to imagine these two debtors receiving advanced degrees as a result of student loans in the amounts of hundreds of thousands of dollars and not wanting to pay anything for their education. On the other hand, it is incredible that the various lenders here would advance to these debtors student loans in the amounts they did and at the same time expect to get paid in full.

Transcript, March 16, 2006, at 3:11–18. *See also Nys*, 446 F.3d at 945 n. 6 ("We cannot fault a debtor for [choosing which skills she will pursue during her education] when, later on, it turns out that despite her best efforts her skills are simply not sufficient to allow her to earn adequate sums to repay accumulated principal and interest."). *Cf. Educ. Credit Mgmt. Corp. v. Degroot*, 339 B.R. 201, 212–13 (D.Or. 2006) ("choosing to incur debt in pursuit of an education later in life is a decision within the debtor's control, and simply because things do not work out as the debtor

had hoped does not make age alone a sufficient reason to discharge student loans").

■■■■ The Government argues that Brett could earn more by working on a contract basis but according to Brett that work rarely lasts more than one year, it does not include benefits, sick days, or paid holidays, and it would require him to move around the country which is disruptive to the children and Janeth's ability to find work. A debtor has an obligation to maximize income, perhaps even by accepting part time work or work outside of a chosen field. *Birrane*, 287 B.R. at 498 ("there is nothing in the record that indicates Birrane [who had paying work approximately 25 hours per week] is unemployable in other areas ... although her hourly pay may be less than what she is used to"). On the other hand there are limits to what a debtor and his or her family must do to maximize income. *See Nys*, 308 B.R. at 442 (debtor was "51 years old and has lived in Humboldt County for more than 20 years, having a home and family ties there, making moving an unavailable option"); *Nys*, 446 F.3d at 945 n. 6 (rejecting argument by lender that "the debtor must either uproot her family and move, or switch careers to try to obtain a higher paying job").

We do not mean to suggest that the bankruptcy court necessarily has to reach all of these issues, or is limited to these issues. *See also Nys*, 446 F.3d at 947 (listing numerous factors). We have addressed them because the parties have briefed them and have argued that they are dispositive. They are not.

### V. CONCLUSION

Debtors incurred a huge amount of student debt. Having paid almost nothing on that debt they now seek to discharge it all, despite being young, healthy, and highly

educated. Congress has set a high bar for discharging student loan debts and based on the excerpts of record we cannot say that Debtors are entitled to a full discharge of that debt. At the same time, the bankruptcy court found that Debtors could never pay the full amount of their debt unless one or both of them wins the lottery. Therefore, if they can satisfy the bankruptcy court that they have met their burdens to prove their good faith and to establish how much debt they will be unable to pay without undue hardship, they should be entitled to a partial discharge. The bankruptcy court's ruling to the contrary is REVERSED and the case is REMANDED.