FILED

APR 16 2013

SUSAN M SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

ORDERED PUBLISHED

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | | |
|---|---|---|
| In re: | ) | BAP No. AZ-11-1233-RnPaKi |
| | ) | |
| JANET ROSE ROTH, | ) | Bk. No. 09-00317-RJH |
| | ) | |
| Debtor. | ) | Adv. No. 10-0764-RJH |
| _____ | ) | |
| | ) | |
| JANET ROSE ROTH, | ) | |
| | ) | |
| Appellant, | ) | |
| v. | ) | **O P I N I O N** |
| | ) | |
| EDUCATIONAL CREDIT MANAGEMENT | ) | |
| CORPORATION, | ) | |
| | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |
| _____ | ) | |

Submitted Without Oral Argument on September 20, 2012[1]

Filed – April 16, 2013

Appeal from the United States Bankruptcy Court
for the District of Arizona

Honorable Randolph J. Haines, Bankruptcy Judge, Presiding

_____

Appearances:     Appellant Jane Rose Roth on brief;
                 Julie K. Swedback, Esq. on brief for appellee
                 Educational Credit Management Corporation.

_____

_____

[1]  Pursuant to Fed. R. Bankr. P. 8012, after notice to the parties, the Panel by order entered July 3, 2012, unanimously determined after examination of the briefs and record that oral argument was not needed.

Before:   RENN,[2] PAPPAS and KIRSCHER, Bankruptcy Judges.

Opinion by Judge Renn
Concurrence by Judge Pappas

RENN, Bankruptcy Judge:

This pro se appeal arises from a judgment rendered after trial in an adversary proceeding which excepted from discharge under 11 U.S.C. § 523(a)(8)[3] Debtor Janet Roth's ("Debtor") student loan debt to Educational Credit Management Corporation ("ECMC").  We REVERSE and REMAND.

///
///
///
///
///
///
///
///
///
///
///

---

[2]   Hon. Thomas M. Renn, U. S. Bankruptcy Judge for the District of Oregon, sitting by designation.

[3]   Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

# I. FACTS[4]

From 1989 to 1995 Debtor took out thirteen federally guaranteed student loans totaling over $33,000 under the Federal Family Educational Loan Program ("FFELP Loans") to fund her attendance at Mesa Community College and Arizona State University. In addition to the FFELP Loans, Debtor also took out five direct loans administered by the U.S. Department of Education ("DOE"). During her attendance at school, Debtor studied communications, information technology, and education, but she never graduated as a family issue necessitated her quitting the programs.

Debtor's employment history is long and varied. She has worked for extended periods as an information management clerk for the U.S. Defense Department, a ticketing counter clerk for several

---

[4] Debtor asks us to review "all appellant's exhibits submitted throughout [the adversary proceeding below]." Aplt.'s Opening Br. at 6. However, her excerpt of record does not include all of those exhibits. Nevertheless, we have exercised our discretion to take judicial notice of the electronic record in the adversary, as "we make reasonable allowance for pro se litigants and construe their papers liberally." Ozenne v. Bendon (In re Ozenne), 337 B.R. 214, 218 (9th Cir. BAP 2006); see also O'Rourke v. Seaboard Sur. Co.(In re E.R. Fegert, Inc.), 887 F.2d 955, 957-58 (9th Cir. 1989)(court may take judicial notice of bankruptcy case below). We have not, however, considered documents that neither we nor the parties have identified as part of the trial court record. Kirshner v. Uniden Corp. of Am., 842 F.2d 1074, 1077-78 (9th Cir. 1988). For example, Debtor has adduced two pages of account statements, Aplt. ER at 17-18, with line-items she argues indicate "voluntee [sic] payments," on the FFELP Loans, which she found [post trial] "digging through old student loan files." Aplt. Opening Br. at 4. Those account statements have not been considered.

airlines, an information technology technician for a collection of used car dealerships, an administrative assistant for Arizona State University, and a government contract analyst for the Veterans Administration. Her last job was as a cake decorator for Wal-Mart. She has often worked more than one job at the same time to make ends meet. In 2008, her adjusted gross income was $34,789. In 2009, it was $40,098.

Debtor made no voluntary payments on the FFELP Loans. She defaulted on three of them in 1998, and on the rest in 2001. Pre-default she was eligible for forebearances. At one point, she testified she sent paperwork to Chicago regarding a forebearance, but she never heard back and never followed up. Other than that attempt, she did not seek any deferments or forebearances. Neither did she make any efforts to restructure the loans to reduce the payments or otherwise modify their terms. She testified that before she filed bankruptcy, she did not know whom to call to obtain a modification.

For a time the DOE administratively garnished her wages. Debtor testified she was unaware she had two lenders and presumed the collection activity pertained to the FFELP Loans. It appears at some point one or more of ECMC's predecessors-in-interest attempted to also garnish Debtor's wages but, because the DOE had a continuing garnishment in place or she was unemployed, those attempts were unsuccessful. It also appears that at certain times Debtor's federal and state tax refunds were offset against her student loan

-4-

obligations. The record, however, is unclear as to whether those offsets were initiated by the DOE (or its agents) or by ECMC's predecessors. It is clear from the record that Debtor was unable to identify which loans received payments or even that two lenders were involved in administering the various loans.

At present, Debtor suffers from several chronic medical conditions including a thyroid condition, diabetes, macular degeneration, cataracts, high cholesterol, and depression. Some of her medical conditions required surgery. Debtor has also incurred serious shoulder, knee, and wrist injuries that have limited her activities. All of her medical ills necessitate many medical appointments, which in some instances have precluded eligibility for new employment. Although hampered by her ailments, Debtor feels she is not totally disabled from working unless her "sight goes and . . . [she] can't read." [Trial Tr. (April 27, 2011) 42:22].

On January 8, 2009, Debtor filed for Chapter 7 relief pro se. On April 27, 2010, she commenced an adversary proceeding in the bankruptcy court seeking to have both the FFELP and DOE Loans discharged. Shortly thereafter, the FFELP Loans were assigned to ECMC. As of January 5, 2011, the aggregate balance on the FFELP Loans was at least $95,403.86. Based on an administrative discharge of the DOE loans, the DOE was dismissed from the adversary proceeding pursuant to an order entered June 1, 2010.

From July 2009 to January 2011, Debtor applied unsuccessfully for over 280 federal jobs. She concentrated on this employment

sector, because she had previously been a federal employee and believed she had preferential rehiring rights. She also applied for non-federal positions. She testified that she's worked for forty-five years and wanted to find a job, although it would only be justified to do so if it paid above minimum wage. She further testified that if her discharge was denied, she might either enroll in the income-based repayment plan discussed below, or remain unemployed.

Approximately six months after the adversary proceeding was filed, ECMC sent Debtor information and an application to administratively discharge her FFELP debt based on total and permanent disability. Debtor did not apply because she did not consider herself sufficiently disabled. Approximately three months later, ECMC advised Debtor she was eligible under the federal William D. Ford program to consolidate all thirteen of her FFELP loans and participate in the "income-based repayment plan" ("IBRP"). The IBRP requires the borrower to make a twenty-five-year commitment to dedicate on a monthly basis 1/12th of fifteen percent of the amount her average gross income exceeds 150% of the federal poverty level for the debtor's family size.[5] 34 C.F.R. § 685.221. The plan

[5] The IBRP should be distinguished from the "Income Contingent Repayment Program" ("ICRP"), 34 C.F.R. § 685.209(a), another repayment plan offered under the Ford program and referenced in many student loan cases. E.g., Braun v. Sallie Mae (In re Braun), 2012 WL 5199163 at *8 (Bankr. E.D. Va. October 19, 2012)(comparing the IBRP and ICRP).

-6-

term would be twenty-five years; thereafter, any remaining balance would be forgiven. 34 C.F.R. § 685.221(f).[6] Because Debtor's income did not exceed the federal poverty level, her initial monthly IBRP payment would have been zero, and would have remained so until the 150% income threshold was met. Debtor understood the terms and conditions of the IBRP but did not apply for it, reasoning she could do so at any time, even if the bankruptcy court denied discharge of her student loans, and that her energy was best put toward regaining her health so she could get back to work. When the adversary proceeding was tried on April 27, 2011, Debtor was sixty-four years old, unemployed, and had no dependents. Her only income was social security of $774 per month. Despite living frugally, her monthly expenses regularly exceeded her income.

In reaching its decision to except the FFELP Loans from Debtor's discharge, the bankruptcy court applied the Brunner[7] test, which has three prongs. The court had no trouble concluding Debtor had met the first two prongs. That is, the evidence showed that, based on her current income and expenses, she could not maintain a minimal standard of living if forced to repay the FFELP Loans, and,

---

[6] Under the present Internal Revenue Code, this forgiveness of debt would be taxable income, 26 U.S.C. § 61(a)(12), except to the extent the debtor was, at that time, insolvent. 26 U.S.C. § 108(a)(1)(B),(a)(3),(d)(3).

[7] See Brunner v. N.Y. State Higher Educ. Servs., Inc. (In re Brunner), 831 F.2d 395, 396 (2d Cir. 1987), aff'g and adopting 46 B.R. 752, 756 (S.D.N.Y. 1985).

-7-

further, additional circumstances indicated it was more likely than not that her financial difficulties would persist for a significant portion of the Loans' repayment period. [Trial Tr. at 58:20-59:16].

The court, however, struggled with Brunner's third prong, which, as discussed in detail below, requires that a debtor make "good faith" efforts to repay the loans. It agreed that Debtor's participation in the IBRP was not required to find good faith, because imposing such a requirement would replace rights given under § 523(a)(8) with those of an administrative remedy. [Id. at 61:2-17]. Further, in examining past efforts, the court questioned whether good faith played a role at all when the evidence indicated that, even assuming best or good faith efforts, Debtor could never have paid the FFELP Loans in full and in fact, notwithstanding such efforts, would still be faced with a balance that was an "undue hardship" to pay. [Id. at 59:17-60:16]. Despite such concerns, however, the court felt constrained by Ninth Circuit precedent which it felt required consideration of past efforts to reduce the balance of the student loan debt. Thus, the court concluded that Debtor's lack of voluntary payments, and her lack of efforts to renegotiate, obtain a forebearance, or obtain a disability discharge, tipped the good faith balance away from her. [Id. at 60:17-24].

## II. JURISDICTION

The bankruptcy court had jurisdiction over this proceeding under 28 U.S.C. §§ 1334 and 157(b)(2)(I). We have jurisdiction under 28 U.S.C. § 158(b).

-8-

# III. ISSUE

Whether the bankruptcy court erred in concluding that Debtor failed to make a good faith effort to repay her student loans.[8]

# IV. STANDARD OF REVIEW

Under § 523(a)(8), student loans are excepted from the discharge a debtor receives in bankruptcy unless repaying those loans would "impose an undue hardship on the debtor and the debtor's dependents." In United Student Aid Funds v. Pena (In re Pena), 155 F.3d 1108, 1112 (9th Cir. 1998), the Ninth Circuit adopted the three-pronged test set out in Brunner, 831 F.2d at 396, to determine whether the undue hardship standard has been met. The last of those prongs requires the court to determine whether the debtor made "good faith efforts to repay the loans." Id.[9] The primary issue in this

---

[8] Contrary to Rule 8006, Debtor did not submit a statement of issues on appeal. However, her opening and supplemental briefs sufficiently identify the issues. ECMC has responded to those issues and has claimed no prejudice from the lack of the Rule 8006 statement. Further, based on the briefs and the record, we are able to completely understand the issues. Debtor may therefore go forward without a separate Rule 8006 statement. Gertsch v. Johnson & Johnson, Fin. Corp. (In re Gertsch), 237 B.R. 160, 166 (9th Cir. BAP 1999).

[9] As referenced above, the first two prongs require a showing:

> (1)that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; and (2) that additional circumstances exist indicating that this state of affairs is likely to persist
>
> (continued...)

-9-

appeal is whether the bankruptcy court erred in reaching its conclusion on the "good faith" prong. A threshold question is under what standard should that determination be reviewed. In light of seemingly contradictory language in Ninth Circuit precedent, we publish this opinion to clarify the appropriate standard of review.

What is clear from the caselaw is that the ultimate undue hardship determination is reviewed de novo, as it requires a determination of the "legal effect of the bankruptcy court's findings regarding the student's circumstances." Educ. Credit Mgmt. Corp. v. Mason (In re Mason), 464 F.3d 878, 881 (9th Cir. 2006)(quoting Rifino v. United States (In re Rifino), 245 F.3d 1083, 1087 n.2 (9th Cir. 2001)). More particularly, the undue hardship determination is a mixed question of fact and law. Hedlund v. Educ. Res. Inst. Inc., 468 B.R. 901, 906 (D. Or. 2012); Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour), 433 F.3d 393, 398 (4th Cir. 2005); Educ. Credit Mgmt. Corp. v. Blackbird (In re Blackbird), 2008 WL 8444793 at *3 (9th Cir. BAP 2008).[10] "A mixed question of law and fact occurs when the historical facts are established; the rule of law is undisputed . . .; and the issue is whether the facts

---

[9](...continued)
> for a significant portion of the repayment
> period of the student loans.

Id.

[10] Under Fed. R. App. P. 32.1 and 9th Cir. BAP Rule 8013-1(c)(2), Blackbird may be cited for its persuasive, but not precedential, value.

-10-

satisfy the legal rule." Murray v. Bammer (In re Bammer), 131 F.3d 788, 792 (9th Cir. 1997). Because "[m]ixed questions . . . require consideration of legal concepts and the exercise of judgment about the val ues that animate legal principles," they are reviewed de novo. Id. De novo review is independent and gives no deference to the trial court's conclusion. Warfield v. Salazar (In re Salazar), 465 B.R. 875, 878 (9th Cir. BAP 2012).

It is also clear that the bankruptcy court's determinations of the historical facts underlying its undue hardship determination are reviewed for clear error. Educ. Credit Mgmt. Corp. v. Howe (In re Howe), 319 B.R. 886, 888 (9th Cir. BAP 2005). The clear error standard applies to implied as well as express factual findings. Tighe v. Valencia (In re Guadarrama), 284 B.R. 463, 477 (C.D. Cal. 2002). Review for clear error is "significantly deferential." Baker v. Mereshian (In re Mereshian), 200 B.R. 342, 345 (9th Cir. BAP 1996). The appellate court should not reverse unless it is left with "a definite and firm conviction that a mistake has been committed." Id. (internal quotation omitted). The reviewing court may not reverse simply because it is convinced it would have decided the case differently. Id. "Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." Id. (internal quotation omitted). Further, the reviewing court must give due regard to the opportunity of the bankruptcy court to judge the credibility of witnesses. Rule 8013; Thiara v. Spycher Bros. (In re Thiara), 285 B.R. 420, 427 (9th Cir.

BAP 2002). "This deference is also given to inferences drawn by the . . . [bankruptcy] court." Id.

To summarize, the ultimate undue hardship determination is reviewed de novo because it is a mixed question of fact and law, and the factual findings regarding the circumstances underpinning that determination are reviewed for clear error. What is not so clear is the standard of review to be applied to the three individual Brunner prongs. Are they factual determinations reviewed for clear error or mixed questions reviewed de novo? In Pa. Higher Educ. Assistance Agency v. Birrane (In re Birrane), 287 B.R. 490 (9th Cir. BAP 2002), without discussing the issue, we held, at least by implication, that the Brunner prongs are mixed questions entitled to de novo review. Id. at 500-501 (bankruptcy court did not commit an error of law in applying prong one to those factual findings, but it did err as a matter of law in applying prongs two and three). Birrane has subsequently been followed for this proposition. See, e.g., Hedlund, 468 B.R. at 913.[11] These holdings, however, do not end the inquiry as they must be squared with language in Pena, Rifino, and Mason. In each of those cases, while acknowledging the ultimate undue hardship determination is a question of law reviewed de novo, the court nevertheless used "clear error" language in its analysis

---

[11] Likewise, in Blackbird, an unpublished memorandum, we expressly held that review of the good faith prong is de novo. 2008 WL 8444793 at *3.

of the individual <u>Brunner</u> prongs.[12]  Because the two positions (i.e., de novo (mixed question) review of the ultimate undue hardship determination and clear error review of the individual prongs) are inherently contradictory, we are called to determine which one must yield.  We hold that it must be the latter.

The three <u>Brunner</u> prongs are not elements a court throws into a vial, and then mixes and spins to arrive at an amalgam called

[12]    Applying . . . [the <u>Brunner</u>] test,
the bankruptcy court did not <u>clearly err</u> in finding that (1) the Penas could not maintain a minimal standard of living and repay their student loans, (2) their unfortunate financial situation was likely to continue for a substantial portion of the repayment period, and (3) they made a good-faith attempt to pay the loans.

<u>Pena</u>, 155 F.3d at 1114 (emphasis added).

We conclude that the bankruptcy court did not <u>clearly err</u> in finding that Rifino's standard of living would fall below a minimal level if she were required to repay her student loans.

. . . .

[W]e hold that the bankruptcy court <u>clearly erred</u> in concluding that Rifino's circumstances are likely to persist for a significant portion of the repayment period of her student loans.

<u>Rifino</u>, 245 F.3d at 1088-89 (emphasis added).

[W]e conclude that the bankruptcy court <u>clearly erred</u> in finding that Mason demonstrated good faith efforts to repay his loans.

<u>Mason</u>, 464 F.3d at 885 (emphasis added).

-13-

"undue hardship." Rather, they are stand-alone requirements. Failure to prove any one precludes discharge. Carnduff v. U.S. Dep't of Educ. (In re Carnduff), 367 B.R. 120, 127 (9th Cir. BAP 2007). Thus, if the ultimate undue hardship determination is reviewed de novo because it is a mixed question, and mixed questions involve "the exercise of judgment about the values that animate legal principles," Bammer, 131 F.3d at 792 (emphasis added), it must then follow that the three independent prongs are also mixed questions requiring de novo review. If not, and they instead are simply factual determinations, the reviewing court, upon finding no clear error as to each prong, would be bound to uphold the bankruptcy court as to the ultimate undue hardship determination. Such a mechanical application of the prongs, however, would negate the reviewing court's ability to "exercise judgment."

Our conclusion is buttressed by precedent outside the Ninth Circuit. Most courts which have directly addressed the issue, including the Third and Fourth Circuit Courts of Appeals, have held that each Brunner prong is reviewed de novo. E.g., Educ. Credit Mgmt. Corp. v. Mosko (In re Mosko), 515 F.3d 319, 324 (4th Cir. 2008); Brightful v. Pa. Higher Educ. Assistance Agency (In re Brightful), 267 F.3d 324, 327 (3d Cir. 2001); Educ. Credit Mgmt. Corp. v. Curiston, 351 B.R. 22, 27 (D. Conn. 2006); But see Krieger v. Educ. Credit Mgmt. Corp., 2013 WL 1442305 at *2 (7th Cir. April 10, 2013).

-14-

Returning to the appeal at bar, the main issue is whether Debtor met her burden of proof on Brunner's good faith prong. We will review the factual underpinnings of that determination under the deferential clear error standard, but will conduct a non-deferential de novo review of the bankruptcy court's ultimate good faith conclusion.

## V. DISCUSSION

Under § 523(a)(8), the lender has the initial burden to establish the existence of the debt and that the debt is an educational loan within the statute's parameters. Lavy v. U.S. Dep't of Educ. (In re Lavy), 2008 WL 4964721 at *3 (Bankr. W.D. Wash. Nov. 14, 2008). ECMC has met those burdens.[13] The burden

---

[13] Prior to the trial, Debtor stipulated that the loans in question were educational loans as contemplated in § 523(a)(8). ["Joint Pre-trial Statement," Adv. Doc. #59 at 6:4-5]. The bankruptcy court then granted ECMC's motion for partial summary judgment on this issue. Debtor has not challenged this ruling on appeal.

Debtor also stipulated that the loans had an "outstanding aggregate balance of no less than $95,403.86 as of January 5, 2011." [Id. at 6:6-7]. On summary judgment the bankruptcy court held that the aggregate principal amount of the debt was $33,160, which accrued annual interest at a minimum of 3.28% on each of the thirteen loans since they were originally disbursed. Although somewhat disjointed, Debtor's briefs could be construed to challenge the amount of the aggregate debt. At trial, ECMC's witness Julie Swedback computed it at $95,890.20 as of April 26, 2011. However, the parties did not seek liquidation of the debt as a contested issue. [Id. at 6:26]. Further, the bankruptcy court did not liquidate the debt in either its partial summary judgment or its judgment denying discharge. Neither party argues this was error. Thus, for purposes of this appeal, we need not concern ourselves

(continued...)

-15-

then shifts to the debtor, Id., to prove all three Brunner prongs, Rifino, 245 F.3d at 1087-88, by a preponderance of the evidence. Nys v. Educ. Credit Mgmt. Corp. v. Nys (In re Nys), 308 B.R. 436, 441 (9th Cir. BAP 2004), aff'd on other grounds, 446 F.3d 938 (9th Cir. 2006). The bankruptcy court held that Debtor met Brunner's first two prongs but failed to prove the third. The only issue on appeal is whether its conclusion as to prong three was in error.[14]

As noted, under Brunner's third prong, a debtor must make good faith efforts to repay the student loans.[15] "Good faith is

---

[13](...continued)
with the exact amount of debt, and may, even disregarding Ms Swedback's testimony, rely in our analysis on Debtor's stipulation that the debt was at least $95,403.86 as of January 5, 2011, approximately four months before trial.

[14] While ECMC, as the prevailing party at trial, could have, without cross-appeal, defended the bankruptcy court's judgment on any ground it properly raised below, Valencia, 284 B.R. at 477, it has chosen not to challenge the bankruptcy court's conclusions as to the first two prongs.

[15] The "good-faith" requirement fulfills the purpose behind the adoption of section 523(a)(8). Brunner, 46 B.R. at 754-55. Section 523(a)(8) was a response to "a 'rising incidence of consumer bankruptcies of former students motivated primarily to avoid payment of education loan debts.' " Id., (quoting the Report of the Commission on the Bankruptcy Laws of the United States, House Doc. No. 93-137, Pt. I, 93d Cong., 1st Sess. (1973) at 140 n. 14). This section was intended to "forestall students . . . from abusing the bankruptcy system." Id.

(continued...)

-16-

measured by the debtor's efforts to obtain employment, maximize income, and minimize expenses." Mason, 464 F.3d at 884 (internal quotation omitted). "Courts will also consider a debtor's effort--or lack thereof--to negotiate a repayment plan," Id. (internal quotation omitted), as this is an "important indicator of good faith." Birrane, 287 B.R. at 499. However, failure to negotiate or accept an alternative repayment plan is not dispositive. Educ. Credit Mgmt. Corp. v. Jorgensen (In re Jorgensen), 479 B.R. 79, 89 n.4 (9th Cir. BAP 2012)(debtor's failure to accept ECMC's "Graduate Repayment Option" was not de facto evidence of a lack of good faith). Any offered repayment plan's terms, duration, and consequences need to be examined. Carnduff, 367 B.R. at 136-37. These consequences include future tax liability and negative credit ratings. Id.

Courts also examine: 1) whether the debtor has made any payments on the loan prior to filing for discharge, Jorgensen, 479 B.R. at 89, "although a history of making or not making payments is, by itself, not dispositive[,]" Mason, 464 F.3d at 884 (internal citation omitted); 2) whether the debtor has sought deferments or forebearances, East v. Educ. Credit Mgmt. Corp. (In re East), 270 B.R. 485, 495 (Bankr. E.D. Cal. 2001); 3) the timing of the debtor's attempt to have the loan discharged, Educ. Credit Mgmt. Corp. v. DeGroot (In re DeGroot), 339 B.R. 201, 214 (D. Or. 2006); and 4)

[15](...continued)
Pena, 153 F.3d at 1111.

whether the debtor's financial condition resulted from factors beyond her reasonable control, <u>Birrane</u>, 287 B.R. at 500, as a debtor may not willfully or negligently cause her own default. <u>Id.</u> The "good faith" obligation continues even after an adversary proceeding is filed to determine the dischargeability of the student loan debt. <u>Id.</u>

Examining the factors, Debtor did not make any voluntary payments. However, lack of even minimal voluntary payments is not lack of good faith if the debtor did not have the financial wherewithal to make them. <u>England v. United States (In re England)</u>, 264 B.R. 38, 48 (Bankr. D. Idaho 2001); <u>Hurley v. Student Loan Acq. Auth. of Ariz., et. al., (In re Hurley)</u>, 258 B.R. 15, 25-26 (Bankr. D. Mont. 2001). While the bankruptcy court found Debtor was able to make payments in the "few good earning years" she had [2008 and 2009],[16] [Trial Tr. at 60:12-14], it made no findings as to how much those payments would have been. The record, however, is complete enough for us to find that any payment would have been modest as it is uncontroverted Debtor has never had significant income above necessary expenses. <u>Veal v. Am. Home Mortg. Servicing, Inc. (In re</u>

---

[16] In her closing argument, Debtor stated that even though she made $40,000 [in 2009], she still had obligations, including a mortgage, and still had children at home, which is why "she worked a job and a half." [Trial Tr. at 57:24-58:3]. She further stated in argument that she had "four kids [she] . . . had to support" when she moved to Arizona. [<u>Id.</u> at 58:7-8]. We have not considered these statements in our factual analysis. <u>United States v. Lazarenko</u>, 564 F.3d 1026, 1037 (9th Cir. 2009) (statements in argument are not evidence).

Veal), 450 B.R. 897, 919 (9th Cir. BAP 2011) (an appellate panel may conduct review if a complete understanding of the issues may be obtained from the record as a whole or if there can be no genuine dispute about omitted findings). Further, implied in the court's findings as to 2008 and 2009 is a finding, which we will not disturb, that, except for those years, Debtor was unable to make voluntary payments. See Johnson Sw., Inc. v. Habert Energy Corp. (In re Johnson Sw., Inc.), 205 B.R. 823, 827 (N.D. Tex. 1997)("A reviewing court may assume that the trial court made an implied finding consistent with its general holding so long as the implied finding is supported by the evidence."). Indeed, this inability may have been due to the DOE's ongoing garnishments and the tax refund offsets. At least one court has held that making payments through garnishment or offsets with the debtor's consent demonstrates good faith. Hamilton v. U.S. Dep't of Educ. (In re Hamilton), 361 B.R. 532, 558 (Bankr. D. Mont. 2007). In this regard, Debtor testified she did not realize she had two separate lenders and assumed the FFELP loans were being paid through these forced collection efforts. The bankruptcy court made no express findings as to Debtor's overall credibility or her credibility on this particular point. However, it did accept Debtor's testimony relevant to prongs one and two, and thus we can infer the court thought Debtor generally credible. Habert Energy Corp., 205 B.R. at 827. Given this inference, Hamilton's rationale should also apply to Debtor's good faith, even

-19-

if mistaken, belief she was paying ECMC's predecessor through forced collection.

The bankruptcy court found Debtor made no effort to obtain forebearances, apparently discounting her testimony that at one point she mailed forebearance paperwork to Chicago but never heard anything afterwards. Given the testimony's lack of detail, we will not set aside this finding as clearly erroneous.

Debtor has admitted she did not attempt to negotiate a payment plan or make any effort to apply for an administrative discharge when presented with that option. In mitigation of such failures, Debtor testified that prepetition she did not know restructuring arrangements were available. Even were this true, the evidence shows Debtor to be an intelligent person who, if unsure about available restructuring options, had the sophistication to make appropriate inquiries. Her failure to do so was within her reasonable control. Birrane, 287 B.R. at 500.

While the bankruptcy court made no detailed findings as to the timing of the bankruptcy, the evidence was uncontradicted that Debtor's attempt to discharge her student loans came at least a decade after they went into repayment, and thus there was no "rush to the courthouse." Cf. Brunner, 831 F.2d at 397 (declining to find good faith when debtor filed adversary proceeding seeking discharge within a month of when her loans first became due).

Likewise the bankruptcy court made no express findings on Debtor's efforts to obtain employment, maximize income, and minimize

-20-

expenses. However, in holding for her on Brunner's first and second prongs, the court necessarily found that, at least going forward, Debtor had minimized her expenses and maximized her earning potential. Birrane, 287 B.R. at 496 (minimized current expenses are part of first prong); In re Nys, 446 F.3d at 947 (maximized income potential (which subsumes possibility of obtaining more lucrative employment) part of second prong). Given the evidence on Debtor's frugality, education, age, health, earning potential, and desire to work, these findings are not clearly erroneous. As to Debtor's historical efforts, ECMC does not dispute them. In any event, the record is sufficiently developed to allow us a complete understanding, Veal, 450 B.R. at 919, and upon our review, the preponderance of the evidence indicates Debtor: 1)remained full-time employed until shortly before she filed Chapter 7, often working two jobs; 2) used her job skills as productively as she could; and 3) lived frugally, all indicating historical good faith efforts to obtain employment, maximize income, and minimize expenses.

Thus, to sum up the factual findings underlying the good faith analysis, Debtor made good faith efforts to obtain employment, maximize income, and minimize expenses. Further, she did not come to bankruptcy court seeking discharge until many years after the loans were in repayment status. In contrast, she made no full or even partial voluntary payments despite being able to do so in select years. However, this deficiency is mitigated somewhat by her good faith belief in other years that the FFELP Loans were being

-21-

paid through garnishments and tax offsets.  Further, she did not seek forebearances.  However, a forebearance would merely have deferred payment, and, given Debtor's limited finances, would not have materially improved her prospects to pay on her loans.  She also did not submit an application to administratively discharge the loan, claiming she did not meet the eligibility requirements for that program.  That claim has not been contradicted, and we will not hold against her the failure to engage in a futile exercise.

Finally and perhaps of most significance, Debtor refused to enroll in the IBRP.  In light of Ninth Circuit caselaw, we cannot discount this refusal.  In fact, it has often tipped the good faith balance against a debtor.  See, e.g., Mason, 464 F.3d at 885 (failure to enroll in the ICRP); Birrane, 287 B.R. at 500 (same).  The question is whether, in light of Debtor's individual circumstances, Rifino, 245 F.3d 1087 n.2, it should do so here.  The evidence and the bankruptcy court's findings show that not only would Debtor currently not be required to make a payment under the IBRP, but it is more probable than not she would never be required to make a payment.  Given that forecast, which is not clearly erroneous, we conclude that Debtor's refusal to participate in the IBRP should not be weighed against her, especially given her age, poor health, and limited income or prospects.

Potentially disastrous tax consequences could await her at the termination of the twenty-five year payment period or could await her estate and thus her heirs upon her death.  Perhaps more

-22-

concretely, we see no real purpose in making Debtor jump through the hoops of applying for, and enrolling in, the IBRP and then reporting her income every year. The IBRP was set up to allow borrowers to pay an affordable amount toward retirement of their student loan debt. However, when absolutely no payment is forecast, the law should not impose negative consequences for failing to sign up for the program. This is consistent with the general maxim that the law does not require a party to engage in futile acts. Ohio v. Roberts, 448 U.S. 56, 74 (1980), abrogated on other grounds, Crawford v. Washington, 541 U.S. 36 (2004). Congress could not have intended such a lengthy, empty commitment as a requirement for a determination of undue hardship.

## VI. CONCLUSION

In the end, we must, in our de novo review, weigh the bankruptcy court's factual findings (which were not clearly erroneous) and our own findings (given the completeness of the record) in "exercis[ing] [our] . . . judgment about the values that animate," Bammer, 131 F.3d at 792, "good faith efforts to repay." Although a close case, in considering all the factors, we conclude Debtor has met her burden. We therefore REVERSE and REMAND this matter to the bankruptcy court with instructions that it enter judgment discharging the FFELP Loans.

Concurrence begins on next page.

///

-23-

PAPPAS, Bankruptcy Judge, Concurring:

Given the bankruptcy court's fact findings regarding Debtor's dismal financial history and circumstances, and applying a de novo standard of review, I concur that the bankruptcy court erred in declining to grant a hardship discharge of the student loan debt to Debtor under § 523(a)(8). However, because I understand how the bankruptcy court felt restricted by precedent in reaching its decision, I write separately to highlight that the analysis required by Pena/Brunner to determine the existence of an undue hardship is too narrow, no longer reflects reality, and should be revised by the Ninth Circuit when it has the opportunity to do so. Put simply, in this era, bankruptcy courts should be free to consider the totality of a debtor's circumstances in deciding whether a discharge of student loan debt for undue hardship is warranted.

Congress has never defined the circumstances constituting the sort of undue hardship justifying the discharge of an educational debt under § 523(a)(8), apparently preferring that bankruptcy courts craft a working definition. While it might have been appropriate and helpful when adopted, respectfully, the Brunner test for determining undue hardship is truly a relic of times long gone.

Brunner was decided by the Second Circuit in 1987 to implement the original student loan hardship discharge exception included in a still-new Bankruptcy Code. Brunner v. N.Y. State Higher Educ. Serv. Corp., 831 F.2d 395, 396 (2d Cir. 1987). That

-1-

early version of § 523(a)(8) provided that a debtor's student loan debt could not be discharged unless either it first became due five years before the date of the bankruptcy filing or excepting such debt from discharge would impose an undue hardship on the debtor and the debtor's dependents. Importantly, in those days, without regard to the debtor's current finances, if a student loan had not been collected within the five years after it became due, Congress directed that it would be discharged in the student's bankruptcy case.

Brunner typified the sort of student loan discharge cases encountered by bankruptcy courts at that time. The debtor sought to discharge $9,000 in student loans in a bankruptcy case filed just a few months after she obtained her master's degree, immediately after the grace period before payments became due expired, after only a few months of unemployment, and having made no efforts to pay anything on the loans. Brunner v. N.Y. State Higher Educ. Serv. Corp. (In re Brunner), 46 B.R. 752, 753 (S.D.N.Y. 1985), aff'd, 831 F.2d 394 (2d Cir. 1987). Not surprisingly, in addition to articulating its now-famous "test," the Brunner court held that the debtor had not made a case for an undue hardship discharge in part because, given her circumstances, she had not made a good faith effort to repay the modest debt. 831 F.2d at 396-97.

In 1990, Congress amended § 523(a)(8), significantly expanding the discharge exception to apply to more than just educational "loans" to include any "educational benefit,

scholarship, or stipend payment." Crime Control Act of 1990, Pub. L. No. 101-647 (1990). The discharge exception was further widened to encompass any obligation "that first became due more than 7 years (exclusive of any extension of the repayment period) before the date of filing of the [bankruptcy] petition." Id. This was the version of the Code applied by the Ninth Circuit when it adopted the Brunner test for undue hardship in In re Pena in 1998. United Student Aid Funds, Inc. v. Pena (In re Pena), 155 F.3d 1108, 1112 (9th Cir. 1998).

In In re Pena, the court affirmed the grant of a hardship discharge of the debtor's $9,300 in student loans used to acquire technical training that the court described as "useless" to him in obtaining employment. 155 F.3d at 1110. Moreover, Mrs. Pena suffered from a chronic mental disability, the debtors' income was inadequate to pay their normal living expenses, and there was no evidence that their situation would improve in the future. Under these facts, and applying the Brunner factors (or any other test, for that matter), the decision to grant the debtors a hardship discharge of the student loans is certainly defensible.

Over the years, Congress made more changes to § 523(a)(8), all excepting a broader array of educational obligations from discharge in bankruptcy. For example, in 1998, Congress did away with the requirement that only those student loan debts that were less than seven years into the repayment period could be excepted from discharge in bankruptcy. See Higher Education Amendments of

-3-

1998, Pub. L. No. 105-244, § 971(a) (1998). Under this amendment, student-debtors could no longer hope to discharge even the oldest of their educational obligations without demonstrating that repayment would constitute an undue hardship to them or their dependents.

Most recently, in 2005, under pressure from lenders and lobbyists, Congress expanded the discharge exception to include, for the first time, private student loans. Given the geometric increases in the amount of new and outstanding educational loans, this change to § 523(a)(8) meant that the pool of potentially nondischargeable education-related debts was now a truly huge one.

As can be seen, while at one time bankruptcy courts were required to focus on a debtor's circumstances only during the five to seven years after student loans became due, after 1998, the relevant time for examining whether a debtor had made good faith efforts to repay a student loan had no limits. And after the 2005 amendment, the number and kinds of student loan debts potentially excepted from discharge skyrocketed.

In addition to these significant changes in the statutory landscape, educational borrowing has also changed drastically since the Brunner test was formulated and In re Pena adopted it. Back then, bankruptcy courts only infrequently dealt with student loan discharge issues, and as shown by the facts of those cases, the amounts in controversy were usually modest. As a practical matter, if a student loan was excepted from discharge, the debtor could be expected to repay it within a reasonable time.

-4-

But things are different now. Unlike the loans made mostly to traditional students by local banks and colleges in the 1970s, today, a variety of lenders now compete to provide "financial assistance" for a broad assortment of study and training, without regard to the wisdom of a student's decision to borrow or their particular circumstances, and with nary a thought given to the borrower's ability to repay the debts. Today, facing the mammoth costs of a modern education, nearly all students must borrow heavily to finance their futures. Much of that student loan debt is not incurred to finance a traditional college education, but instead goes to pay for other types of training, frequently delivered by "for-profit" companies, which may not significantly improve the debtor's chances for employment or substantial earnings. Astoundingly, today there is nearly $1 trillion in outstanding educational debt, see Donghoon Lee, Household Debt and Credit: Student Debt at 2 (Federal Reserve Bank of New York, Feb. 28, 2013), http://newyorkfed.org/newsevents/mediaadvisory/2013/Lee022813.pdf; the average student loan balance is close to $25,000, Id. at 7; and over 12 percent of borrowers owe $50,000 or more. Id. at 6. On the heels of a record recession with high unemployment, it is not surprising that many of the students who borrowed to finance their education and training did not complete those programs. It is also hardly surprising that the proportion of student loans that are delinquent is at near-record high levels. Id. at 11 and 15

(explaining that 17 percent of borrowers in repayment programs are ninety-plus days delinquent).

As with the debtor in this appeal, many outstanding student loan debts are now decades old, owed by borrowers who never really had the ability to make substantial payments on the balances. <u>Id.</u> at 4 (noting that 34 percent of all student loans are 40 years old or older). And so, with accruing interest, those loan balances grow large. It is also increasingly common that the debtor seeking bankruptcy relief from student loan debt is not the student but, instead, a family member or friend who agreed to co-sign or guarantee the loans.

Unlike in <u>Brunner</u> and <u>Pena</u>, today, bankruptcy courts must frequently attempt to predict a debtor's potential to repay a six-digit educational obligation over his or her entire lifetime. In many of those cases, the benefit the debtor received from the education or training financed with these "loans" may be marginal, and the balances due to creditors exceed the debtor's debt-service abilities. It would seem that in this new, different environment, in determining whether repayment of a student loan constitutes an undue hardship, a bankruptcy court should be afforded flexibility to consider all relevant facts about the debtor and the subject loans. But <u>Brunner</u> does not allow it. In addition to requiring that a debtor demonstrate a current inability to pay a student loan while maintaining a minimal standard of living, <u>Brunner</u> mandates that the debtor show "additional circumstances" to prove that his or her

impecunious status will persist into the future. <u>Brunner</u>, 831 F.2d at 396; <u>Pena</u>, 155 F.3d at 1111. Requiring that a debtor demonstrate that his or her financial prospects are forever hopeless is an unrealistic standard.

<u>Brunner</u>'s additional requirement that a debtor show that he or she has made "good faith efforts" to repay a student loan is also of little utility in determining true undue hardship. Of course, as a matter of statutory construction, this "prong" of the test lacks any textual basis in the Bankruptcy Code. As a practical matter, requiring a debtor to clear this hurdle can condemn the student-borrower to a lifetime of burdensome debt under one or more of the creditors' long-term repayment programs, some of which may span thirty-to-forty years. This aspect of the <u>Brunner</u> test also fails to account for the potentially devastating debt-forgiveness tax consequences to the debtor resulting from the "successful" completion of such a program, which is one reason that the repayment programs are not that popular with borrowers. At bottom, requiring debtors to participate in these creditor programs as a condition to obtaining a bankruptcy discharge simply means that creditors, not bankruptcy judges, will decide which loans can be repaid, and which should properly be forgiven. This is surely not what Congress intended in enacting § 523(a)(8).

///

///

///

The Ninth Circuit should reconsider its adherence to <u>Brunner</u>. It should instead, like a few other courts,[17] craft an undue hardship standard that allows bankruptcy courts to consider all the relevant facts and circumstances on a case-by-case basis to decide, simply, can the debtor currently, or in the near-future, afford to repay the student loan debt while maintaining an appropriate standard of living. This approach could allow the bankruptcy court, after weighing the facts of each case, to decide that a student-debtor, whose debt financed training that did not allow him or her to achieve any significant earnings, to discharge a large loan balance even in the absence of a debilitating illness or handicap. It could allow an elderly debtor to escape the burden of decades-old student loans when her prospects for repayment have disappeared, even though the debtor has not participated in a repayment plan with the creditor. And this hardship test would focus on the contemporary world of student loan debt, not circumstances that existed thirty or more years ago.

---

[17] To be sure, <u>Brunner</u> still predominates in the circuits as the go-to test for assessing undue hardship. The advantages to the more timely and enlightened "totality of circumstances" approach is explained in the First Circuit BAP's decision in <u>Bronsdon v. Educ. Credit Mgmt. Corp. (In re Bronsdon)</u>, 435 B.R. 791 (1st Cir. BAP 2010); <u>see also</u> <u>Long v. Educational Credit Mgmt. Corp. (In re Long)</u>, 322 F.3d 549, 554 (8th Cir. 2003) (observing that "fairness and equity require each undue hardship case to be examined on the unique facts and circumstances that surround the particular bankruptcy [case].").

As America's experience in the recent "mortgage crisis" should have taught us, employing an undue hardship discharge test that requires those who cannot repay educational loans, most of which are government-backed, to attempt to do so creates problems for all. Under § 523(a)(8), Congress did not draw bright lines, but instead presumably intended that bankruptcy courts have the flexibility to make fact-based decisions in individual cases about the need for student loan debt relief. Pena/Brunner restricts the bankruptcy courts' ability to do so, and its application in the Ninth Circuit should be reconsidered.